ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF CLARENDON | FOR THE THIRD JUDICIAL CIRCUIT |
| A. S. and C. J. by and through their Guardian ad Litem Ashley Berry, | Case No.: |
| Plaintiffs, | **SUMMONS** |
| v. | |
| South Carolina Department of Social Services (SCDSS), Tasha Barkley, Lakisha M. Hamilton, Shaneka Dixon, Kelly McCabe, Dana S. Pressley, Amanda Quinlan-Head (Graham), Deborah Reynolds, Yolanda M. Gamble Speights, Latoya Jackson, and Michael Leach, | |
| Defendants. | |

TO:　DEFENDANT'S ABOVE-NAMED

　　　　YOU ARE HEREBY SUMMONED and required to answer the Complaint in this matter, a copy of which is herewith served upon you, and to serve a copy of your Answer to the said Complaint on the subscribers at, Post Office Box 610, Camden, South Carolina 29021, within thirty (30) days after the service hereof, exclusive of the day of such service, and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

　　　　　　　　　　　　　　　　Respectfully Submitted,

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

By:   s/Deborah J. Butcher
Deborah J. Butcher
S.C. Bar No. 74029
Fed. Bar No. 10731
Robert J. Butcher
S.C. Bar No. 74722
Fed. Bar No. 9767
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone:     (803) 432-7599
Facsimile:     (803) 432-7499
rbutcher@camdensc-law.com
dbutcher@camdensc-law.com

Attorneys for Plaintiff

Camden, South Carolina
October 3, 2023

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF CLARENDON | FOR THE THIRD JUDICIAL CIRCUIT |
| A.S. and C.J. by and through their Guardian ad Litem Ashley Berry, | Case No.: |
| Plaintiffs, | **COMPLAINT**<br>***(JURY REQUESTED)*** |
| v. | |
| South Carolina Department of Social Services (SCDSS), Tasha Barkley , Lakisha M. Hamilton, Shaneka Dixon, Kelly McCabe, Dana S. Pressley, Amanda Quinlan-Head (Graham), Deborah Reynolds, Yolanda M. Gamble Speights, Latoya Jackson,  and Michael Leach, | |
| Defendants. | |

The Plaintiffs, complaining of the Defendants, would respectfully show the following:

## I.    PARTIES AND JURISIDICTION

1.      Plaintiffs A.S. and C.J. are citizens and residents of the County of Clarendon, State of South Carolina. Plaintiffs are both minors under the age of eighteen. This action is brought by and through Ashley Berry acting as guardian ad litem. Ashley Berry is an attorney licensed to practice in the State of South Carolina.

### South Carolina Department of Social Services Defendants

2.      Defendant **South Carolina Department of Social Services [SCDSS]** is an agency of the State of South Carolina created by the General Assembly of the State of South Carolina. Defendant SCDSS is responsible for investigating cases of child abuse and neglect and ensuring there is probable cause before taking a child into its custody.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Once probable cause for the custody of an abused or neglected child or vulnerable adult is no longer present, SCDSS has a duty to relinquish custody of the child.

3.    Upon information and belief, Defendant Tasha Barkley is a citizen and resident of the County of Sumter, State of South Carolina. Upon information and belief, during the times alleged herein, Defendant Tasha Barkley was employed by SCDSS as an investigator. Defendant Tasha Barkley was responsible for the investigation and continued seizure and abuse of the minor Plaintiffs. Tasha Barkley is being sued in her individual capacity.

4.    Upon information and belief, Defendant Shaneka Dixon is a citizen and resident of the County of Clarendon, State of South Carolina. Upon information and belief, during the times alleged herein, Defendant Shaneka Dixon was employed by SCDSS as an investigator. Defendant Shaneka Dixon was responsible for the investigation and continued seizure and abuse of the minor Plaintiffs. Shaneka Dixon is being sued in her individual capacity.

5.    Upon information and belief, Defendant Kelly McCabe is a citizen and resident of the County of Charleston, State of South Carolina. Upon information and belief, during the times alleged herein, Defendant Kelly McCabe was employed by SCDSS as an investigations case supervisor and Shaneka Dixon directly reported to her. Defendant Kelly McCabe was responsible for the investigation and continued seizure and abuse of the minor Plaintiffs. Kelly McCabe is being sued in her individual capacity.

6.    Upon information and belief, Defendant Dana S. Pressley is a citizen and resident of the County of Clarendon, State of South Carolina. During the times alleged

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

herein, Defendant Dana S. Pressley was employed by SCDSS as a case manager. Defendant Dana S. Pressley was responsible for managing the case SCDSS opened involving minor Plaintiffs. Defendant Dana S. Pressley was additionally responsible for ensuring the safety of the minor Plaintiffs and the continued abuse and seizure of the minor Plaintiffs. Dana S. Pressley is being sued in her individual capacity.

7.     Upon information and belief, Defendant Deborah Reynolds is a citizen and resident of the County of Clarendon, State of South Carolina. During the times alleged herein, Defendant Deborah Reynolds was employed by SCDSS as a Case Supervisor. Defendant Deborah Reynolds was responsible for overseeing the case SCDSS opened involving minor Plaintiffs and the actions of SCDSS employees involved in the case. Defendant Deborah Reynolds was additionally responsible for ensuring the safety of the minor Plaintiffs and the continued seizure and abuse of the minor Plaintiffs. Deborah Reynolds is being sued in her individual capacity.

8.     Upon information and belief, Defendant Yolanda M. Gamble Speights is a citizen and resident of the County of Williamsburg, State of South Carolina. During the times alleged herein, Defendant Yolanda M. Gamble Speights was employed by SCDSS under Foster Care Services. Defendant Yolanda M. Gamble Speights was responsible for ensuring that minor Plaintiffs were in a safe and appropriate foster placement. Yolanda M. Gamble Speights was also responsible for the continued abuse and seizure of the minor Plaintiffs. Yolanda M. Gamble Speights is being sued in her individual capacity.

9.     Upon information and belief, Defendant Lakisha M. Hamilton is a citizen and resident of the County of Clarendon, State of South Carolina. During the times

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

alleged herein, Defendant Lakisha M. Hamilton was employed by SCDSS as a Foster Care Services Supervisor. Defendant Lakisha M. Hamilton was responsible for ensuring that proper foster care was provided to minor Plaintiffs and during the continued abuse and seizure of the minor Plaintiffs. Lakisha M. Hamilton is being sued in her individual capacity.

10.    Upon information and belief, Defendant Latoya Jackson is a citizen and resident of the County of Charleston, State of South Carolina. During the times alleged herein, Defendant Latoya Jackson was employed by SCDSS as a Foster Care Services Supervisor. Defendant Latoya Jackson was responsible for ensuring that proper foster care was provided to minor Plaintiffs and during the continued abuse and seizure of the minor Plaintiffs. Latoya Jackson is being sued in her individual capacity.

11.    Upon information and belief, Defendant Amanda Quinlan-Head (Graham), is a citizen and resident of the County of Florence, State of South Carolina. During the times alleged herein, Defendant Amanda Quinlan-Head (Graham), was employed by SCDSS as an investigator. Defendant Amanda Quinlan-Head (Graham) was responsible for ensuring that a proper investigation was conducted as to minor Plaintiffs and during the continued abuse and seizure of the minor Plaintiffs. Defendant Amanda Quinlan-Head (Graham) is being sued in her individual capacity.

12.    Michael Leach is the State Director of the South Carolina Department of Social Services.  He is a citizen and resident of Richland County in the State of South Carolina. He is being sued in his official capacity pursuant to Plaintiffs' request for injunctive relief and at all times was acting under color of law.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

**Jurisdiction**

13.     That this Court has jurisdiction over the subject matter of this action under Article V Section 11 of the Constitution of South Carolina; Sections 14-1-80, 15-78-100, and 33-56-180 of the Code of Laws of South Carolina 1976, as amended; and the Common Law of South Carolina. This Court has subject matter jurisdiction pursuant to S.C. Const. art. V, § 11, S.C. Code Ann. § 15-78-100(b), and 42 U.S.C. § 1983.

14.     That because the acts and omissions alleged herein occurred in Clarendon County, South Carolina venue is proper in this Court under Sections 15-78-100 and 15-7-30 of the Code of Laws of South Carolina 1976, as amended.

## II.     Chronology of Events Related to Damages Claims.

15.     Plaintiffs incorporate paragraphs 1 – 14 as if stated herein verbatim.

16.     On or about June 2021, Plaintiff A.S. at the age of fourteen (14) believed she may have become pregnant. She informed her mother. Her mother had A.S. take two pregnancy tests, both of which showed a negative result.

17.     A.S. had no reason to doubt the validity of the pregnancy test.

18.     A.S. believed that she was continuing to have her period.

19.     A.S.'s body did not change in a manner that put her on notice that she was pregnant.

20.     On or about March 23, 2022, A.S. began experiencing bad abdominal pain. The pains were so intense that A.S. was taken to the McLeod Health Clarendon by her grandmother to have a medical doctor examine her.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

21.     Upon examination, A.S. was informed by medical staff that she was pregnant and completely dilated.

22.     At fifteen (15) years of age A.S. gave birth to her son, C.J.

23.     A.S. was informed that she tested positive for THC.

24.     Upon information and belief, the baby was negative for drugs at birth.

25.     Upon information and belief, the umbilical cord was sent off for testing and the results were positive for THC.

26.     Upon information and belief, a report was made to South Carolina Department of Social Services who in turn investigated the matter.

27.     Upon information and belief, Defendants never sought a determination as to the validity or the legality of the THC found as a result of the drug test of A.S. given at the hospital.

28.     On or about March 24, 2021, SCDSS Program Coordinator Lakisha Hamilton arrived at the hospital and spoke to A.S.

29.     A.S. informed SCDSS Program Coordinator Lakisha Hamilton that she did not know she was pregnant and that, to her knowledge, she had not taken any illegal substances during her pregnancy.

30.     Upon information and belief, while at the hospital, SCDSS Program Coordinator Lakisha Hamilton spoke to the registered nurse and was informed that A.S. claimed that she did not know she was pregnant when she came to the hospital for cramps.

31.     Upon information and belief, while at the hospital, SCDSS Program Coordinator Lakisha Hamilton spoke to the custodial mother of A.S. and was informed

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

by the custodial mother that she did not know A.S. was pregnant, that A.S. had told her when she had sexual intercourse, A.S. had taken took two pregnancy test both with negative results, and that A.S. appeared to continue to have her period.

32.     On or about April 21, 2022, SCDSS filed a Complaint in Clarendon County Family Court alleging abuse and neglect against the mother of A.S. This Complaint was later Amended to include allegations of abuse and neglect against A.S. concerning the unvalidated drug test from Clarendon Memorial Hospital.

33.     SCDSS later deemed that their allegations of abuse and neglect against the mother of A.S. were unfounded.

34.     Throughout the investigation and court proceedings, A.S. maintained that she did not know she was pregnant until she gave birth and that she had not taken any illegal substances.

35.     Defendants were also informed by the caregivers of A.S. that they were not aware of A.S.'s pregnancy until she gave birth and that had A.S. known she would have told them.

36.     Defendants never presented any evidence that A.S. knew she was pregnant prior to her giving birth.

37.     Defendants knew or should have known that had A.S. actually tested positive for an illegal substance at birth it is not abuse or neglect if she did not know she was pregnant when consuming an illegal substance.

38.     Defendants also never attempted to obtain a valid drug test of A.S. for legal purposes.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

39.     Defendants never obtained any determinative evidence that A.S. had consumed any illegal substances during her pregnancy.

40.     Despite A.S.'s denials of any abuse and neglect against her baby and the lack of any evidence of abuse or neglect, Defendants refused to dismiss their Court action.

From on or about April 21, 2022 through March 1, 2023 SCDSS Tesla Barkley, Lakisha Hamilton, Shaneka Dixon, Kelly McCabe, Dana Pressley, Amanda Quinlan-Head, Deborah Reynolds, Yolanda Gabble, Latoya Jackson, and Michael Leach continued to:

   a.  Force A.S. and C.J. to live in an abusive environment;

   b.  Live away from their family which they desperately needed for support;

   c.  Ignored A.S.'s request to return home;

   d.  Force them to live in conditions that Defendants knew or should have known were affecting Plaintiffs mental and emotional health;

   e.  And at times kept A.S. and C.J. apart.

All of which caused A.S. and C.J to suffer unnecessary pain, suffering, physical harm, mental anguish, and emotional harm.

41.     Defendants knew, or should have known, that if there was no evidence that A.S. abused her unborn child they should have dismissed their Family Court action.

42.     Defendants did not allow A.S. and C.J. to return home to A.S.'s mother, Casey Johnson, even though the siblings of A.S. remained in the home of Casey Johnson and there were no allegations of abuse and neglect against Casey Johnson.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

43.     Defendants eventually did separate A.S. from C.J.  by placing A.S. in the home of Casey Johnson and maintaining C.J. in foster care resulting in A.S. and C.J. missing C.J.'s first Christmas as a family and causing great emotional harm.

44.     The Clarendon County Family Court case against A.S. was judicially dismissed at the close of SCDSS's case in chief.

45.     Throughout the pending Family Court action Defendants acted with a total disregard for the safety and wellbeing of A.S. and C.J. in that they:

   a.   Maintained an action against A.S. for abuse and neglect when they knew, or should have known, that there was no evidence of abuse or neglect;

   b.   Maintained A.S. and C.J. in unsafe conditions causing physical and mental harm and which continues to cause such harm;

46.     The Defendants' gross negligence and deliberate indifference caused A.S. and C.J. to suffer unnecessary pain, suffering, physical harm, mental anguish, and emotional harm.

**II.      Chronology of Events Related to Injunctive Relief Claims.**

47.     Plaintiffs incorporate paragraphs 1 – 46 as if stated herein verbatim.

48.     Pursuant to S.C. Code Ann. §63-7-20(6), South Carolina states that "child abuse or neglect" occurs when:

> (a) the parent, guardian, or other person responsible for the child's welfare:
> …
>> (iii) fails to supply the child with adequate food, clothing, shelter, or education as required under Article 1 of Chapter 65 of Title 59, supervision appropriate to the child's age and development, or health care though financially able to do so or offered financial or other reasonable means to do so and the failure to do so has caused or presents a substantial risk of causing physical or mental injury.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

However, a child's absences from school may not be considered abuse or neglect unless the school has made efforts to bring about the child's attendance, and those efforts were unsuccessful because of the parents' refusal to cooperate. For the purpose of this chapter 'adequate health care' includes any medical or nonmedical remedial health care permitted or authorized under state law;

S.C. Code Ann. §63-7-20(6).

49.     Pursuant to S.C. Code Ann. 63-7-1660(F):


(1) It is presumed that a newborn child is an abused or neglected child as defined in Section 63-7-20 and that the child cannot be protected from further harm without being removed from the custody of the mother upon proof that:
   (a) a blood or urine test of the child at birth or a blood or urine test of the mother at birth shows the presence of any amount of a controlled substance or a metabolite of a controlled substance unless the presence of the substance or the metabolite is the result of medical treatment administered to the mother of the infant or the infant, or
   …
   (c) a blood or urine test of another child of the mother or a blood or urine test of the mother at the birth of another child showed the presence of any amount of a controlled substance or a metabolite of a controlled substance unless the presence of the substance or the metabolite was the result of medical treatment administered to the mother of the infant or the infant, or
   …

S.C. Code Ann. 63-7-1660(F).

50.     On December 20, 2018, President Trump signed into law the Agricultural Improvement Act of 2018, Pub. L. 115-334 (2018 Farm Bill). "The 2018 Farm Bill legalized hemp production for all purposes within the parameters laid out in the statute." Exhibit 1, Memorandum, Executive Summary of New Hemp Authorities, Stephen Alexander Vaden, General Counsel for the United States Department of Agriculture (USDA) (May 28, 2019). The USDA concluded that "…hemp has been removed from schedule I of the Controlled Substances Act ("CSA") and is no longer a controlled

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

substance. Hemp is defined under the 2018 Farm Bill to include any cannabis plant, or derivative thereof, that contains not more than 0.3 percent delta-9 tetrahydrocannabinol ("THC") on a dry-weight basis." Id., *3, ¶1.

51.    On March 28, 2019, the South Carolina General Assembly passed 2019 Act No. 14, "The Hemp Farming Act". S.C. Code Ann. §46-55-10, *et seq*. The State Act adopted the 2018 Farm Bill's definitions for THC levels and "Hemp Products".

52.    On July 10, 2019, the South Carolina Attorney General issued its first Advisory Opinion on "on several aspects of the Hemp Farming Act (Act 14 of 2019, formerly H. 3449) which was signed into law by Governor McMaster on March 28, 2019." Exhibit 3, S.C. Attorney General Opinion, 2019 S.C. A.G. LEXIS 54 (July 10, 2019). The South Carolina Attorney General concluded:

> …possession or sale of material containing more than delta-9 THC concentration of more than 0.3 percent using post-decarboxylation or similarly reliable methods would likely be deemed to constitute marijuana. As the Court stated in *U.S. v. Mallory*, *supra*, in the federal Farm Bill, "Congress finally statutorily removed hemp from the definition of 'marijuana' under the CSA. ... "Thus, as you noted in your letter, if material contains more than delta-9 THC concentration of not more than 0.3 percent, based upon the relevant circumstances, possession or retail sale would be "punishable by all currently existing South Carolina state and federal laws prohibiting possession, distribution, possession with intent to distribute and trafficking marijuana." Of course, we defer to law enforcement in making such factual determination.

Exhibit 3, S.C. Attorney General Opinion, *13, 2019 S.C. A.G. LEXIS 54, (July 10, 2019).

53.    On April 15, 2021, the South Carolina Department of Agriculture (SCDA)Consumer Protection Division submitted its "South Carolina Hemp Farming State Plan" to the USDA. Exhibit 2, *South Carolina Hemp Farming Plan*, South Carolina

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Department of Agriculture, Consumer Protection Division (April 15, 2021). The SCDA

defined "Acceptable hemp THC level" as:

> "Acceptable hemp THC level" is the application of the measurement of uncertainty to the reported delta-9 tetrahydrocannabinol content concentration level on a dry weight basis producing a distribution or range that includes 0.3% or less. This definition affects neither the "Federally defined THC level for hemp," as defined below nor, the definition of "marijuana," as defined below. When a laboratory tests a sample, it must report the delta-9 tetrahydrocannabinol content concentration level on a dry weight basis and the measurement of uncertainty. The acceptable hemp THC level for the purpose of compliance with the requirements of this State Plan is when the application of the measurement of uncertainty to the reported delta-9 tetrahydrocannabinol content concentration level on a dry weight basis produces a distribution or range that includes 0.3% or less. For example, if the reported delta-9 tetrahydrocannabinol content concentration level on a dry weight basis is 0.35% and the measurement of uncertainty is +/−0.06%, the measured delta-9 tetrahydrocannabinol content concentration level on a dry weight basis for this sample ranges from 0.29% to 0.41%. Because 0.3% is within the distribution or range, the sample is within the acceptable hemp THC level for the purpose of plan compliance.

Exhibit 2, *South Carolina Hemp Farming Plan*, South Carolina Department of

Agriculture, Consumer Protection Division (April 15, 2021).

54.    On October 4, 2021, the South Carolina Attorney General issued a second

opinion addressing The Hemp Farming Act, S.C. Code Ann. §46-55-10, *et seq*. In its

opinion, the Attorney General determined that delta-8 THC products remained illegal,

along with any other isomer of THC except, delta-9 THC concentration of not more than

0.3 percent on a dry weight basis. Exhibit 4, S.C. Attorney General Opinion, *6, 2021

S.C. A.G. LEXIS 49, (October 4, 2021).

55.    At this time, SCDSS charges South Carolina's parents with neglect if they

test positive for any amount of THC in the parents' system, even THC that is legal under

the Hemp Farming Act.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

56.     SCDSS's marijuana testing regimen does not differentiate between the amount of THC in a parent's system and whether the THC consumed was concentration of not more than 0.3 percent on a dry weight basis. In addition, the Agency's marijuana testing regimen does not differentiate among delta-9 THC, delta-8 THC, or other THC isomers.

57.     It does not appear that SCDSS has taken any steps to procure a testing regimen that will differentiate between the amount of delta-9 THC or the types of THC.

58.     In this matter, SCDSS took no steps to determine if Plaintiff's positive drug test was for delta-9 THC, which is legal.

59.     As in this matter, South Carolina's parents are having their children removed due to their use of legal THC products.

60.     As the Agency has no means of determining whether THC is legal or illegal, Plaintiffs assert that the Agency's continued use of drug testing for THC is capricious, arbitrary, and the testing itself sweeps innocent parents and children into the clutches of SCDSS and the foster care system.

### III.    CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION
**(Gross Negligence – South Carolina Tort Claims Act – South Carolina Department of Social Services)**

61.     Plaintiffs incorporate paragraphs 1 – 60 as if stated herein verbatim.

62.     That under the South Carolina Tort Claims Act, § 15-78-10 *et seq.* of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina, Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

63.     That Plaintiffs allege Defendant SCDSS owed a duty of care to A.S. and C.J. because it is statutorily charged by the General Assembly to provide social services to A.S. and C.J. using generally accepted social work standards.

64.     Plaintiffs A.S. and C.J. were both clients of SCDSS.

65.     That SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in its child protective services and continued to knowingly maintain A.S. and C.J. in abusive conditions away from family and maintain a family court case alleging abuse against A.S. without any evidence of abuse and neglect over an approximant one year period.

66.     That SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in its child protective services and continued a Family Court action while A.S. and C.J. were in foster care by continuing to falsely allege A.S. had abused C.J.

67.     That Plaintiffs further allege that Defendant SCDSS's breach of its duty was the proximate cause of Plaintiffs A.S. and C.J.'s damages.

68.     That as a result of the actions of Defendant SCDSS, Plaintiffs A.S. and C.J. suffered damages, mental and emotional harm and suffering, physical harm, harm to their relationship with each other, loss of enjoyment of life, and future damages as the direct and proximate result of SCDSS's tortious conduct.

69.     That Plaintiffs ask the Court to award damages and costs of this action.

**FOR A SECOND CAUSE OF ACTION**
**(42 U.S.C. §1983 against Tesla Barkley, Lakisha Hamilton, Shaneka Dixon, Kelly McCabe, Dana Pressley, Amanda Quinlan-Head, Deborah Reynolds,**

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

**Yolanda Gabble, and Latoya Jackson for violation of Amendments IV, V, and XIV of the United States Constitution)**

70.     Plaintiffs incorporate paragraphs 1 – 69 as if stated herein verbatim.

71.     That Plaintiffs A.S. and C.J. assert Defendants, Tesla Barkley, Lakisha Hamilton, Shaneka Dixon, Kelly McCabe, Dana Pressley, Amanda Quinlan-Head, Deborah Reynolds, Yolanda Gabble, and Latoya Jackson acting under color of law, violated their constitutional rights under the Fourth, Fifth, and the Fourteenth Amendments of the United States Constitution.

72.     That the Fifth and Fourteenth Amendment to the United States Constitution guarantee the Plaintiffs the right to due process under the law and freedom from unlawful seizure under the Fourth Amendment of the United States Constitution.

73.     That under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

74.     That these case workers were trained to look for evidence of abuse and neglect during child protective services investigations in order to prevent the dismissal of a disclosure of abuse or neglect, or the false assumption of a disclosure of abuse and neglect.

75.     That these case workers knew that if there was no evidence of abuse and neglect during child protective services investigations of abuse or neglect they are obligated to dismiss their court action and return the children.

76.     That these case workers were trained not to falsely allege abuse and neglect, and without any evidence, continued to falsely allege that A.S. abused C.J.

77.     For approximately one year,, Defendants Tesla Barkley, Lakisha Hamilton, Shaneka Dixon, Kelly McCabe, Dana Pressley, Amanda Quinlan-Head,

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Deborah Reynolds,  Yolanda Gabble, and Latoya Jackson failed to find any evidence of abuse or neglect against A.S. yet they continued to prosecute A.S. for knowingly consuming illegal drugs during her pregnancy and/or at the time she delivered C.J., continuing their seizure in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

78.     That pursuant to _S.C. Department of Social Services v. Jennifer M._, 404 S.C. 269 (2013), conduct that occurred while a mother did not know or have reason to know she was pregnant is not abuse or neglect.

79.     That SCDSS had notice of _S.C. Department of Social Services v. Jennifer M._, 404 S.C. 269 (2013) and its holding.

80.     That these actions by Defendants Tesla Barkley, Lakisha Hamilton, Shaneka Dixon, Kelly McCabe, Dana Pressley, Amanda Quinlan-Head, Deborah Reynolds, Yolanda Gabble, and Latoya Jackson were in violation of Defendant SCDSS's policies, training, customs, patterns, and practices and in violation of the Fourth, Fifth, and Fifteenth Amendments of the United States Constitutional and directly harmed Plaintiffs A.S. and C.J.

81.     That A.S. and C.J. suffered damages, mental and emotional harm and suffering, physical harm, harm to their relationship, loss of enjoyment of life, and future damages as the direct and proximate result of the constitutional violations by Defendants Tesla Barkley, Lakisha Hamilton, Shaneka Dixon, Kelly McCabe, Dana Pressley, Amanda Quinlan-Head, Deborah Reynolds, Yolanda Gabble, and Latoya Jackson

82.     That Plaintiffs A.S. and C.J. ask the Court to award damages, punitive damages, and attorney's fees and costs for this action.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

**FOR A THIRD CAUSE OF ACTION**
**(42 U.S.C. §1983 – Injunctive Relief against Department of Social Services**
**and Michael Leach for violation of Due Process under the United States**
**Constitution)**

83.     Plaintiffs incorporate paragraphs 1 – 82 as if stated herein verbatim.

84.     That Plaintiffs A.S. and C.J. assert Defendant Michael Leach, in his official capacity, and his Agency, SCDSS, acting under color of law, violated their constitutional rights under the Fourth, Fifth, and the Fourteenth Amendments of the United States Constitution.

85.     That the Fifth and Fourteenth Amendment to the United States Constitution guarantee the Plaintiffs the right to due process under the law and freedom from unlawful seizure under the Fourth Amendment of the United States Constitution.

86.     That under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

87.     That pursuant to the 2018 Farm Bill and The Hemp Farming Act, consumer products containing not more than 0.3 percent delta-9 tetrahydrocannabinol ("THC") on a dry-weight basis are legal to consume.

88.     That SCDSS had notice of the implementation of the 2018 Farm Bill and The Hemp Farming Act.

89.     That SCDSS has not procured or utilized any tests that differentiates between legal THC and illicit THC.

90.     That Plaintiffs were removed and placed in the custody of SCDSS for A.S.'s positive THC test which failed to differentiate between legal and illicit THC.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

91.    For approximately one year, Defendants Michael Leach and SCDSS failed to find any evidence of abuse or neglect against A.S. while they continued to prosecute A.S. for knowingly consuming illegal drugs during her pregnancy and/or at the time she delivered C.J., continuing their seizure in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

92.    That these actions by Defendants Michael Leach and SCDSS were in violation of the Plaintiffs' Fourth, Fifth, and Fifteenth Amendments of the United States Constitutional and these violations were the proximate cause of the harm to Plaintiffs A.S. and C.J.

93.    That A.S. and C.J. suffered damages, mental and emotional harm and suffering, physical harm, harm to their relationship, loss of enjoyment of life, and future damages as the direct and proximate result of the constitutional violations by Defendants Department of Social Services and Michael Leach.

94.    That Plaintiffs A.S. and C.J. ask the Court to award injunctive relief and attorney's fees and costs for this action.

**WHEREFORE**, Plaintiffs demands a trial by jury and requests judgment against Defendants, jointly and severally, for damages, compensatory damages, punitive damages, when allowed by statute or the common law, attorneys' fees and costs, when allowed by statute or the common law, for interest allowed by law, and all other compensation this Court deems just, equitable and proper.

Plaintiffs also seek injunctive relief as stated above in the third cause of action.

Respectfully Submitted,

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

By:  s/Deborah J. Butcher

Deborah J. Butcher
S.C. Bar No. 74029
Fed. Bar No. 10731
Robert J. Butcher
S.C. Bar No. 74722
Fed. Bar No. 9767
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone:   (803) 432-7599
Facsimile:   (803) 432-7499
rbutcher@camdensc-law.com
dbutcher@camdensc-law.com

Attorneys for Plaintiffs

Camden, South Carolina
October 3, 2023

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356



**United States**
**Department of**
**Agriculture**

**Office of the**
**General**
**Counsel**

**Washington,**
**D.C.**
**20250-1400**

**STEPHEN ALEXANDER VADEN**
**GENERAL COUNSEL**

May 28, 2019

MEMORANDUM

SUBJECT:          EXECUTIVE SUMMARY OF NEW HEMP AUTHORITIES

On December 20, 2018, President Trump signed into law the Agriculture Improvement Act of 2018, Pub. L. 115-334 (2018 Farm Bill). The 2018 Farm Bill legalized hemp production for all purposes within the parameters laid out in the statute.

The Office of the General Counsel (OGC) has issued the attached legal opinion to address questions regarding several of the hemp-related provisions of the 2018 Farm Bill, including: a phase-out of the industrial hemp pilot authority in the Agricultural Act of 2014 (2014 Farm Bill) **(Section 7605)**; an amendment to the Agricultural Marketing Act of 1946 to allow States and Indian tribes to regulate hemp production or follow a Department of Agriculture (USDA) plan regulating hemp production **(Section 10113)**; a provision ensuring the free flow of hemp in interstate commerce **(Section 10114)**; and the removal of hemp from the Controlled Substances Act **(Section 12619)**.

The key conclusions of the OGC legal opinion are the following:

1.  As of the enactment of the 2018 Farm Bill on December 20, 2018, hemp has been removed from schedule I of the Controlled Substances Act and is no longer a controlled substance.

2.  After USDA publishes regulations implementing the new hemp production provisions of the 2018 Farm Bill contained in the Agricultural Marketing Act of 1946, States and Indian tribes may not prohibit the interstate transportation or shipment of hemp lawfully produced under a State or Tribal plan or under a license issued under the USDA plan.

3.  States and Indian tribes also may not prohibit the interstate transportation or shipment of hemp lawfully produced under the 2014 Farm Bill.

4.  A person with a State or Federal felony conviction relating to a controlled substance is subject to a 10-year ineligibility restriction on producing hemp under the Agricultural Marketing Act of 1946. An exception applies to a person who was lawfully growing hemp under the 2014 Farm Bill **before December 20, 2018**, and whose conviction also occurred before that date.

MEMORANDUM
May 28, 2019
Page 2

With the enactment of the 2018 Farm Bill, hemp may be grown only (1) with a valid USDA-issued license, (2) under a USDA-approved State or Tribal plan, or (3) under the 2014 Farm Bill industrial hemp pilot authority.  That pilot authority will expire one year after USDA establishes a plan for issuing USDA licenses under the provisions of the 2018 Farm Bill.

It is important for the public to recognize that the 2018 Farm Bill preserves the authority of States and Indian tribes to enact and enforce laws regulating the **production** of hemp that are more stringent than Federal law.  Thus, while a State or an Indian tribe cannot block the shipment of hemp through that State or Tribal territory, it may continue to enforce State or Tribal laws prohibiting the growing of hemp in that State or Tribal territory.

It is also important to emphasize that the 2018 Farm Bill does not affect or modify the authority of the Secretary of Health and Human Services or Commissioner of Food and Drugs to regulate hemp under applicable U.S. Food and Drug Administration (FDA) laws.

USDA expects to issue regulations implementing the new hemp production authorities in 2019.

Attachment

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356



| | | | |
|---|---|---|---|
| **United States** | **Office of the** | | **Washington,** |
| **Department of** | **General** | | **D.C.** |
| **Agriculture** | **Counsel** | | **20250-1400** |

**STEPHEN ALEXANDER VADEN**
**GENERAL COUNSEL**

May 28, 2019

MEMORANDUM FOR SONNY PERDUE
                    SECRETARY OF AGRICULTURE

SUBJECT:          LEGAL OPINION ON CERTAIN PROVISIONS OF THE
                       AGRICULTURE IMPROVEMENT ACT OF 2018 RELATING TO
                       HEMP

This memorandum provides my legal opinion on certain provisions of the Agriculture
Improvement Act of 2018 ("2018 Farm Bill"), Pub. L. No. 115-334, relating to hemp.

As explained below, this memorandum concludes the following:

1. As of the enactment of the 2018 Farm Bill on December 20, 2018, hemp has been
   removed from schedule I of the Controlled Substances Act ("CSA") and is no longer a
   controlled substance. Hemp is defined under the 2018 Farm Bill to include any cannabis
   plant, or derivative thereof, that contains not more than 0.3 percent delta-9
   tetrahydrocannabinol ("THC") on a dry-weight basis.

2. After the Department of Agriculture ("USDA" or "Department") publishes regulations
   implementing the hemp production provisions of the 2018 Farm Bill contained in subtitle
   G of the Agricultural Marketing Act of 1946 ("AMA"), States and Indian tribes may not
   prohibit the interstate transportation or shipment of hemp lawfully produced under a State
   or Tribal plan or under a license issued under the Departmental plan.

3. States and Indian tribes may not prohibit the interstate transportation or shipment of
   hemp lawfully produced under the Agricultural Act of 2014 ("2014 Farm Bill").

4. A person with a State or Federal felony conviction relating to a controlled substance is
   subject to a 10-year ineligibility restriction on producing hemp under subtitle G of the
   AMA. An exception applies to a person who was lawfully growing hemp under the 2014
   Farm Bill before December 20, 2018, and whose conviction also occurred before that
   date.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 2

This memorandum also emphasizes two important aspects of the 2018 Farm Bill provisions relating to hemp. First, the 2018 Farm Bill preserves the authority of States and Indian tribes to enact and enforce laws regulating the **production** (but not the interstate transportation or shipment) of hemp that are more stringent than Federal law. For example, a State law prohibiting the growth or cultivation of hemp may continue to be enforced by that State. Second, the 2018 Farm Bill does not affect or modify the authority of the Secretary of Health and Human Services or Commissioner of Food and Drugs under applicable U.S. Food and Drug Administration laws.

## I.    BACKGROUND

The 2018 Farm Bill, Pub. L. No. 115-334, enacted on December 20, 2018, includes several provisions relating to hemp.[1] This legal opinion focuses on sections 7605, 10113, 10114, and 12619, summarized below.

- **Section 7605** amends section 7606 of the 2014 Farm Bill (7 U.S.C. § 5940), which authorizes institutions of higher education or State departments of agriculture to grow or cultivate industrial hemp under certain conditions — namely, if the hemp is grown or cultivated for research purposes in a State that allows hemp production. Among other things, section 7605 amends 2014 Farm Bill § 7606 to require the Secretary of Agriculture ("Secretary") to conduct a study of these hemp research programs and submit a report to Congress. Section 7605 also repeals 2014 Farm Bill § 7606, effective one year after the date on which the Secretary establishes a plan under section 297C of the AMA.[2]

- **Section 10113** amends the AMA by adding a new subtitle G (sections 297A through 297E) (7 U.S.C. §§ 1639o – 1639s) relating to hemp production. Under this new authority, a State or Indian tribe that wishes to have primary regulatory authority over the production of hemp in that State or territory of that Indian tribe may submit, for the approval of the Secretary, a plan concerning the monitoring and regulation of such hemp production. *See* AMA § 297B. For States or Indian tribes that do not have approved plans, the Secretary is directed to establish a Departmental plan concerning the monitoring and regulation of hemp production in those areas. *See* AMA § 297C. The

---

[1] The 2014 Farm Bill defines **"industrial hemp"** as "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 5940(a)(2). The 2018 Farm Bill added a new, slightly different definition of **"hemp"** in section 297A of the AMA, defined as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1). Both definitions require a THC concentration of not more than 0.3 percent for a Cannabis sativa L. plant to be considered hemp versus marijuana. For purposes of this legal opinion, I use the terms **"hemp"** and **"industrial hemp"** interchangeably.

[2] The Conference Report accompanying the 2018 Farm Bill explains the effect of the repeal as follows: "The provision also repeals the hemp research pilot programs one year after the Secretary publishes a final regulation allowing for full-scale commercial production of hemp as provided in section 297C of the [AMA]." H.R. REP. NO. 115-1072, at 699 (2018).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 3

Secretary is also required to promulgate regulations and guidelines implementing subtitle
G.  *See* AMA § 297D.  The new authority also provides definitions (*see* AMA § 297A)
and an authorization of appropriations (*see* AMA § 297E).

- **Section 10114** (7 U.S.C. § 1639o note) is a freestanding provision stating that nothing in
  title X of the 2018 Farm Bill prohibits the interstate commerce of hemp or hemp
  products.  Section 10114 also provides that States and Indian tribes shall not prohibit the
  interstate transportation or shipment of hemp or hemp products produced in accordance
  with subtitle G through the State or territory of the Indian tribe.

- **Section 12619** amends the CSA to exclude hemp from the CSA definition of marijuana.
  Section 12619 also amends the CSA to exclude THC in hemp from Schedule I.[3]

In passing the 2018 Farm Bill, Congress legalized hemp production for all purposes within the
parameters of the statute but reserved to the States and Indian tribes authority to enact and
enforce more stringent laws regulating production of hemp.

## II.     ANALYSIS

### A.     <u>As of the Enactment of the 2018 Farm Bill on December 20, 2018, Hemp Has Been Removed from Schedule I of the Controlled Substances Act and Is No Longer a Controlled Substance.</u>

CSA § 102(6) defines "controlled substance" to mean "a drug or other substance, or immediate
precursor, included in schedule I, II, III, IV, or V of part B of this title. . . ."  21 U.S.C. § 802(6).
Marijuana[4] is a controlled substance listed in schedule I of the CSA.  *See* CSA § 202(c)(10),
schedule I (21 U.S.C. § 812(c), Schedule I (c)(10)); 21 C.F.R. § 1308.11(d)(23).

The 2018 Farm Bill amended the CSA in two ways.

- First, 2018 Farm Bill § 12619(a) amended the CSA definition of marijuana to exclude
  hemp.  Before enactment of the 2018 Farm Bill, CSA § 102(16) (21 U.S.C. § 802(16))
  defined marijuana as follows:

    (16) The term 'marihuana' means all parts of the plant Cannabis sativa L., whether growing
    or not; the seeds thereof; the resin extracted from any part of such plant; and every compound,
    manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.  Such term
    does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake
    made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture,
    or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake,

---

[3] For additional background on hemp production prior to enactment of the 2018 Farm Bill, *see* Congressional
Research Service, "Hemp as an Agricultural Commodity" (RL32725) (updated July 9, 2018), *available at*
https://crsreports.congress.gov/product/pdf/RL/RL32725.

[4] This opinion uses the common spelling of "marijuana" except when quoting the CSA, which uses the "marihuana"
spelling.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 4

> or the sterilized seed of such plant which is incapable of germination.

As amended by the 2018 Farm Bill, the CSA definition of marijuana now reads:

> (A) Subject to subparagraph (B), the term 'marihuana' means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.

> (B) The term 'marihuana' does not include—

> (i) hemp, as defined in section 297A of the Agricultural Marketing Act of 1946; or

> (ii) the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

- Second, 2018 Farm Bill § 12619(b) amended the CSA to exclude THC in hemp from the term "tetrahydrocannabinols" in schedule I. As amended by the 2018 Farm Bill, CSA § 202(c)(17), schedule I (21 U.S.C. § 812(c)(17), schedule I) now reads:

> Tetrahydrocannabinols, except for tetrahydrocannabinols in hemp (as defined under section 297A of the Agricultural Marketing Act of 1946).

By amending the definition of marijuana to exclude hemp as defined in AMA § 297A, Congress has removed hemp from schedule I and removed it entirely from the CSA. In other words, hemp is no longer a controlled substance. Also, by amending schedule I to exclude THC in hemp, Congress has likewise removed THC in hemp from the CSA.

It is important to note that this decontrolling of hemp (and THC in hemp) is self-executing. Although the CSA implementing regulations must be updated to reflect the 2018 Farm Bill amendments to the CSA, neither the publication of those updated regulations nor any other action is necessary to execute this removal.

I address here two principal objections to the view that the decontrolling of hemp is self-executing. The first objection is that, because regulations have not been published under CSA § 201, the legislative changes to schedule I regarding hemp are not effective. This objection is not valid.

The typical process for amending the CSA schedules is through rulemaking. Under CSA § 201(a), the Attorney General "may by rule" add to, remove from, or transfer between the schedules, any drugs or other substances upon the making of certain findings. 21 U.S.C. § 811(a). However, the schedules also can be amended directly by Congress through changes to the statute; and Congress has done so several times.[5]

---

[5] *See, e.g.,* Pub. L. 112-144, § 1152 (amending schedule I to add cannabimimetic agents); Pub. L. 101-647, § 1902(a) (amending schedule III to add anabolic steroids).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 5

The second objection is that, because the legislative changes to schedule I regarding hemp are not yet reflected in 21 C.F.R. § 1308.11, the removal is not yet effective. This objection also is not valid.

It is axiomatic that statutes trump regulations. *See Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829 (D.C. Cir. 2006) ("[A] valid statute always prevails over a conflicting regulation[.]"). Congress established the five CSA schedules in statute, providing that "[s]uch schedules shall initially consist of the substances listed in this section." 21 U.S.C. § 812(a).[6] Congress further provided that "[t]he schedules established by this section shall be updated and republished on a semiannual basis during the two-year period beginning one year after October 27, 1970, and shall be updated and republished on an annual basis thereafter." 21 U.S.C. § 812(a). The requirement to update and republish the schedules, however, is not a prerequisite to the effectiveness of the schedules "established by [the statute]." *Id.* In other words, where Congress itself amends the schedules to add or remove a controlled substance, the addition or removal of that controlled substance is effective immediately on enactment (absent some other effective date in the legislation); its addition to or removal from a schedule is not dependent on rulemaking.[7]

To illustrate, Congress amended the CSA in 2012 to add "cannabimimetic agents" to schedule I. That amendment was enacted as part of the Synthetic Drug Abuse Prevention Act of 2012 (Pub. L. 112-144, title XI, subtitle D), which was signed into law on July 9, 2012. Almost six months later, the Drug Enforcement Administration ("DEA") published a final rule establishing the drug codes for the cannabimimetic agents added to schedule I by Congress and making other conforming changes to schedule I as codified in 21 C.F.R. § 1308.11. *See* 78 Fed. Reg. 664 (Jan. 4, 2013). In explaining why notice-and-comment rulemaking was unnecessary, DEA noted that "the placement of these 26 substances in Schedule I **has already been in effect since July 9, 2012**." *Id.* at 665 (emphasis added). In other words, the legislative changes to schedule I were effective immediately upon enactment. The reflection of those changes in 21 C.F.R. § 1308.11, although required by 21 U.S.C. § 812(a), was not necessary for the execution of those changes to schedule I.

Accordingly, enactment of the 2018 Farm Bill accomplished the removal of hemp (and THC in hemp[8]) from the CSA. Conforming amendments to 21 C.F.R. § 1308.11, while required as part

---

[6] "Marihuana" and "Tetrahydrocannabinols" were both included in the initial schedule I established by Congress in 1970.

[7] *Cf. United States v. Huerta*, 547 F.2d 545, 547 (10th Cir. 1977) ("[F]ailure to publish the 'updated' schedules as required by Section 812(a) had no effect upon the validity of those substances initially listed in the five schedules."); *United States v. Monroe*, 408 F. Supp. 270, 274 (N.D. Cal. 1976) ("Thus, while section 812(a) clearly orders the controlled substance schedules to be republished, it is clear that Congress did not intend republication to serve as a reissuance of the schedules, which if done improperly would cause those schedules to lapse and expire. . . . [T]he requirement that the schedules, once 'updated,' be 'republished' was solely for the purpose of establishing one list which would reflect all substances which were currently subject to the Act's provisions. . . .").

[8] Schedule I, as published in 21 C.F.R. § 1308.11, includes a definition of "tetrahydrocannabinols" in paragraph (d)(31) that does not appear in the CSA. Notwithstanding the presence of that definition in the current regulations, I

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 6

of DEA's continuing obligation to publish updated schedules, are not necessary to execute the 2018 Farm Bill changes to schedule I.[9]

**B.    After the Department of Agriculture Publishes Regulations Implementing the Hemp Production Provisions of the 2018 Farm Bill Contained in Subtitle G of the Agricultural Marketing Act of 1946, States and Indian Tribes May Not Prohibit the Interstate Transportation or Shipment of Hemp Lawfully Produced Under a State or Tribal Plan or Under a License Issued Under the Departmental Plan.**

AMA § 297D(a)(1)(A) directs the Secretary to issue regulations and guidelines "as expeditiously as possible" to implement subtitle G of the AMA.  7 U.S.C. § 1639r(a)(1)(A).  These regulations will address the approval of State and Tribal plans under AMA § 297B and the issuance of licenses under the Departmental plan under AMA § 297C.  As explained below, once these regulations are published, States and Indian tribes may not prohibit the transportation or shipment of hemp (including hemp products) produced in accordance with an approved State or Tribal plan or produced under a license issued under the Departmental plan.

Transportation of hemp is addressed in 2018 Farm Bill § 10114.[10]  Subsection (a) provides:

> (a) RULE OF CONSTRUCTION.—Nothing in this title or an amendment made by this title prohibits the interstate commerce of hemp (as defined in section 297A of the Agricultural Marketing Act of 1946 (as added by section 10113)) or hemp products.

7 U.S.C. § 1639o note.  This provision states that nothing in title X of the 2018 Farm Bill

---

am of the opinion that THC in hemp is excluded from THC as a schedule I controlled substance under the CSA by virtue of the 2018 Farm Bill amendments.

[9] Schedule I, as reflected in 21 C.F.R. § 1308.11, includes a separate listing of "marihuana extract" in paragraph (d)(58).  Marijuana extract is not reflected in schedule I in the statute because it was added after 1970 by regulation under CSA § 201.  The term "marihuana extract" is defined in regulation as "an extract containing one or more cannabinoids that has been derived from any plant of the genus Cannabis, other than the separated resin (whether crude or purified) obtained from the plant."  The 2018 Farm Bill amended the definition of "marihuana" to exclude hemp, but because the regulatory definition of "marihuana extract" in schedule I does not use the words "marihuana" or "tetrahydrocannabinols" to define the term, a question arises whether **hemp extract** is still considered to be listed as a schedule I controlled substance.  While the issue is not further addressed in this opinion, I think that the revised statutory definition of "marihuana" has effectively removed hemp extract from schedule I, and that reflecting such in 21 C.F.R. § 1308.11(d)(58) would be merely a conforming amendment.

[10] Hemp transportation is also addressed in annual appropriations acts, which restrict Federal appropriated funds from being used to prohibit the transportation of hemp.  However, those provisions are limited in scope because they address only hemp produced under the 2014 Farm Bill authority, and they address only **Federal** government actions.  That is, while the provisions prohibit Federal actors from blocking the transportation of so-called "2014 Farm Bill hemp," they do not restrict State action in that regard.  *See* Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2019, Pub. L. 116-6, div. B, § 728 (prohibiting funds made available by that Act or any other Act from being used in contravention of 2014 Farm Bill § 7606 or "to prohibit the transportation, processing, sale, or use of industrial hemp, or seeds of such plant, that is grown or cultivated in accordance with [2014 Farm Bill § 7606], within or outside the State in which the industrial hemp is grown or cultivated").  *See also* Commerce, Justice, Science, and Related Agencies Appropriations Act, 2019, Pub. L. 116-6, div. C, § 536 ("None of the funds made available by this Act may be used in contravention of [2014 Farm Bill § 7606] by the Department of Justice or the Drug Enforcement Administration.").

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 7

prohibits the interstate commerce of hemp. However, this provision, standing alone, does not have the effect of sanctioning the transportation of hemp in States or Tribal areas where such transportation is prohibited under State or Tribal law.

Subsection (b), however, specifically prohibits States and Indian tribes from prohibiting the transportation of hemp through that State or Tribal territory. Subsection (b) provides:

> (b) TRANSPORTATION OF HEMP AND HEMP PRODUCTS.—No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 (as added by section 10113) through the State or the territory of the Indian Tribe, as applicable.

7 U.S.C. § 1639o note. In effect, this provision preempts State law to the extent such State law prohibits the interstate transportation or shipment of hemp that has been produced in accordance with subtitle G of the AMA.

As a matter of constitutional law, "[t]he Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any [S]tate to the Contrary notwithstanding. . . .' Under this principle, Congress has the power to preempt [S]tate law." *Arizona v. United States*, 567 U.S. 387, 398-99 (2012) (citing U.S. Const. art. VI, cl. 2). "Under the doctrine of federal preemption, a federal law supersedes or supplants an inconsistent [S]tate law or regulation." *United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016).

Federal courts generally recognize three categories of preemption: (1) express preemption (where Congress "withdraw[s]" powers from the State through an "express preemption provision");[11] (2) field preemption (where States are "precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance");[12] and conflict preemption (where State laws are preempted when they conflict with Federal law, which includes situations "where 'compliance with both federal and [S]tate regulations is a physical impossibility'" or situations "where the challenged [S]tate law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'").[13] *Arizona*, 567 U.S. at 399-400 (citations omitted); *see also Zadeh*, 820 F.3d at 751.

---

[11] *See, e.g.*, 7 U.S.C. § 1639i(b) ("(b) Federal preemption.—No State or a political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food or seed in interstate commerce any requirement relating to the labeling of whether a food (including food served in a restaurant or similar establishment) or seed is genetically engineered (which shall include such other similar terms as determined by the Secretary of Agriculture) or was developed or produced using genetic engineering, including any requirement for claims that a food or seed is or contains an ingredient that was developed or produced using genetic engineering.").

[12] *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 ("[T]he federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the [S]tates.").

[13] *See, e.g.*, 21 U.S.C. § 903 ("No provision of this subchapter shall be construed as indicating an intent on the part of Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 8

Section 10114(b) of the 2018 Farm Bill satisfies the definition of conflict preemption because a State law prohibiting the interstate transportation or shipment of hemp or hemp products that have been produced in accordance with subtitle G of the AMA would be in direct conflict with section 10114(b), which provides that no State may prohibit such activity.[14] Therefore, any such State law has been preempted by Congress. The same result applies to Indian tribes.[15]

In sum, once the implementing regulations are published, States and Indian tribes may not prohibit the shipment of hemp lawfully produced under an approved State or Tribal plan or under a license issued under the Departmental plan.

**C.**     **States and Indian Tribes May Not Prohibit the Interstate Transportation or Shipment of Hemp Lawfully Produced Under the Agricultural Act of 2014.**

Because the 2018 Farm Bill does not immediately repeal the hemp pilot authority in 2014 Farm Bill § 7606 — and because the publication of regulations implementing the hemp production provisions of the 2018 Farm Bill will likely not occur until later in 2019 — the question arises whether States and Indian tribes are prohibited from blocking the interstate transportation or shipment of hemp (including hemp products) lawfully produced under the 2014 Farm Bill. The answer depends on the meaning of the phrase "in accordance with subtitle G of the Agricultural Marketing Act of 1946" in 2018 Farm Bill § 10114(b) (7 U.S.C. § 1639o note). Only hemp produced in accordance with subtitle G is covered by the preemption provision discussed above. As explained below, it is my opinion that the answer to this question is yes, by operation of AMA § 297B(f).

AMA § 297B(f) states the legal effect of the provisions authorizing States and Indian tribes to develop plans for exercising primary regulatory authority over the production of hemp within that State or territory of the Indian tribe. Specifically, section 297B(f) provides:

> (f) EFFECT.—Nothing in this section prohibits the production of hemp in a State or the territory of an Indian tribe—
>
> (1) for which a State or Tribal plan is not approved under this section, if the production of hemp is in accordance with section 297C **or other Federal laws** (including regulations); and
>
> (2) if the production of hemp is not otherwise prohibited by the State or Indian tribe.

---

a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.").

[14] Alternatively, section 10114(b) might be considered an express preemption provision because the statute expressly withdraws the power of a State to prohibit the transportation or shipment of hemp or hemp products through the State.

[15] AMA § 297B(a)(3) contains an anti-preemption provision stating that nothing in § 297B(a) "preempts or limits any law of a State or Indian tribe" that "regulates the production of hemp" and "is more stringent than [subtitle G]." 7 U.S.C. § 1639p(a)(3). However, that anti-preemption provision is limited to the **production** of hemp — not the **transportation** or shipment of hemp — and thus does not conflict with 2018 Farm Bill § 10114(b).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 9

7 U.S.C. § 1639p(f) (emphasis added).

This provision addresses the production of hemp in a State or Tribal territory for which the State or tribe does not have an approved plan under AMA § 297B. This provision acknowledges that, in such a scenario, the production of hemp in that State or Tribal territory is still permissible if it is produced **either** in accordance with the Departmental plan under AMA § 297C **or** in accordance with other Federal laws, and the State or tribe does not otherwise prohibit its production.

The plain language of subtitle G of the AMA, as added by the 2018 Farm Bill, thus clearly contemplates a scenario in which hemp is neither produced under an approved 297B plan nor under a license issued under the Department's 297C plan, but is still legally produced under "other Federal laws." It is my opinion that "other Federal laws" encompasses 2014 Farm Bill § 7606.[16]

To my knowledge, before enactment of 2014 Farm Bill § 7606, the CSA was the only Federal law that authorized the production of hemp. Indeed, the production of hemp — as the "manufacture" of a schedule I controlled substance — was generally prohibited under the CSA except to the extent authorized under a registration or waiver under the CSA. *See* 21 U.S.C. §§ 802(15), 802(22), 822, and 823; 21 C.F.R. part 1301. Given (1) the removal of hemp as a controlled substance under the CSA, (2) the delayed repeal of the 2014 Farm Bill § 7606 authority, and (3) the enactment of the new hemp production authorities in subtitle G of the AMA, it is my opinion that "other Federal laws" refers to the provisions of 2014 Farm Bill § 7606, which are still in effect. Such an interpretation gives immediate effect to the phrase "other Federal laws." It is a "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *See, e.g., Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal quotations and citations omitted).

Therefore, reading AMA § 297B(f) in harmony with 2018 Farm Bill § 10114(b), if the hemp is legally produced in accordance with 2014 Farm Bill § 7606 ("other Federal law"), then, by virtue of AMA § 297B(f), its production is not prohibited. Such hemp would have been produced "in accordance with subtitle G," which specifically addresses just such a scenario, as AMA § 297B(f) is part of subtitle G. Accordingly, under 2018 Farm Bill § 10114(b), a State or Indian

---

[16] That Congress envisioned such a scenario is apparent given the language in 2018 Farm Bill § 7605(b) delaying the repeal of 2014 Farm Bill § 7606 until 12 months **after** the Secretary establishes the 297C plan. Accordingly, this interpretation is not precluded by AMA § 297C(c)(1), which provides: "[i]n the case of a State or Indian tribe for which a State or Tribal plan is not approved under section 297B, it shall be unlawful to produce hemp in that State or the territory of that Indian tribe without a license issued by the Secretary under subsection (b)." Given the reference to "or other Federal laws" in AMA § 297B(f)(1) — and the fact that 2014 Farm Bill § 7606 is still in effect — it would be an absurd reading of AMA § 297C(c)(1) to conclude that hemp produced in accordance with Federal law (2014 Farm Bill § 7606) is, at the same time, unlawful without a separate license issued by the Secretary under the 297C plan. As courts have long recognized, statutory interpretations that "produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 10

tribe may not prohibit the transportation or shipment of so-called "2014 Farm Bill hemp" through that State or Tribal territory.[17]

Recent Developments

I acknowledge that this conclusion is in tension with a recent decision in a case in the District of Idaho, but it also is consistent with a recent decision in a case in the Southern District of West Virginia. Neither court addressed the "other Federal laws" language in AMA § 297B(f)(1), which I find conclusive.

In *Big Sky Scientific LLC v. Idaho State Police*, Case No. 19-CV-00040 (D. Idaho), a magistrate judge found that a shipment of Oregon hemp bound for Colorado and interdicted by Idaho State Police could not have been produced "in accordance with subtitle G" because the State of origin does not yet have an approved plan under AMA § 297B and the Secretary has not yet established a plan under AMA § 297C.[18] The magistrate acknowledged Oregon law authorizing the cultivation of hemp, noting the plaintiff's assertion that the hemp was produced by a grower licensed by the Oregon Department of Agriculture (and, thus, presumably in compliance with 2014 Farm Bill § 7606 requirements).[19] However, in denying the plaintiff's motion for a preliminary injunction, the magistrate concluded that, in enacting the 2018 Farm Bill, Congress intended to "create a regulatory framework around the production and interstate transportation of hemp for purposes of federal law, and that framework is to be contained in the federal (or compliant [S]tate or [T]ribal) plan for production of hemp found in the 2018 Farm Bill."[20] Although the 2018 Farm Bill allows hemp to be transported across State lines, the magistrate found those interstate commerce protections apply only to hemp produced under regulations promulgated under the authority of the 2018 Farm Bill.[21] Therefore, because those regulations do not yet exist, the interdicted hemp is subject to Idaho law prohibiting its transportation.

USDA is not a party in the *Big Sky* case, and this office does not concur with the reasoning of the magistrate regarding the shipment of hemp lawfully produced under the 2014 Farm Bill. In

---

[17] This conclusion seems to be supported in the legislative history as well. In explaining the effect of the preemption provision, the Conference Report states: "While [S]tates and Indian tribes may limit the production and sale of hemp and hemp products within their borders, the Managers, in Sec. 10112 [sic], agreed to not allow [S]tates and Indian tribes to limit the transportation or shipment of hemp or hemp products through the [S]tate or Indian territory." H.R. REP. NO. 115-1072, at 738 (2018). Notably, the Managers referred to hemp generally, not merely hemp produced under a plan developed under subtitle G of the AMA.

[18] *See Big Sky*, ECF Doc. #32, Memorandum Decision and Order Re: Plaintiff's Motion for Preliminary Injunction; *see also* ECF Doc. #6, Memorandum Decision and Order Re: Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Plaintiff's Motion to File Overlength Brief (*available at* 2019 WL 438336 (Feb. 2, 2019)).

[19] *Big Sky*, ECF Doc. #32, at 5, 7-8.

[20] *Id.* at 3.

[21] *Id.* at 19-26.

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 11

interpreting the statutory language, the magistrate correctly noted the well-recognized principle of statutory construction that statutes should not be interpreted "in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous."[22]  However, seemingly ignoring that guiding principle of interpretation, the magistrate did not address the effect of the "other Federal laws" language in AMA § 297B(f) or attempt to give that language any meaning. The Idaho court failed to read the statute as a whole and did not consider the "other Federal laws" clause that I find conclusive.  Given the preliminary nature of the magistrate's ruling, I find his opinion denying a preliminary injunction unpersuasive.[23]

Conversely, the interpretation of 2018 Farm Bill § 10114 advanced by this legal opinion is consistent with a decision issued in the Southern District of West Virginia.  In *United States v. Mallory*, Case No. 18-CV-1289 (S.D. W. Va.), the Department of Justice filed a civil action to seize hemp allegedly grown in violation of the CSA and also outside the scope of the 2014 Farm Bill.  At issue in that case was hemp purportedly grown by a producer licensed by the State of West Virginia under a 2014 Farm Bill § 7606 pilot program, where the hemp seeds were shipped from a Kentucky supplier licensed by the Commonwealth of Kentucky under a 2014 Farm Bill § 7606 pilot program.  The court relied on a combination of laws — the 2014 Farm Bill, the appropriations acts provisions,[24] and the 2018 Farm Bill — to dissolve a preliminary injunction against the defendant[25] and to dismiss entirely the government's case.[26]  In dissolving the preliminary injunction, the court permitted the defendants to transport the hemp product across State lines to Pennsylvania for processing and sale.[27]

Although the *Mallory* court did not have occasion to address any State attempts to block the transportation of hemp, the court did reference 2018 Farm Bill § 10114, noting that it "expressly allows hemp, its seeds, and hemp-derived products to be transported across State lines."[28]  The district judge's opinion addressed hemp produced under 2014 Farm Bill § 7606 and not hemp produced under State, Tribal, or Departmental plans. The conclusion reached by the *Mallory* court is consistent with my interpretation that States cannot block the shipment of hemp, whether

---

[22] *Id.* at 21-22 (citing *Padash v. I.N.S.*, 258 F.3d 1161, 1170-71 (9th Cir. 2004)).  The magistrate continued:

> It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. . . . It is our duty to give effect, if possible, to every clause and word of a statute.

*Id.* at 23 (internal quotations and citations omitted).

[23] Indeed, the magistrate's ruling is under appeal.  *See Big Sky Sci. LLC v. Bennetts*, Case No. 19-35138 (9th Cir.).

[24] *See supra* footnote 10.

[25] *Mallory*, ECF Doc. #60, Memorandum Opinion and Order, 2019 WL 252530 (S.D. W. Va. Jan. 17, 2019).

[26] *Mallory*, ECF Doc. #72, Memorandum Opinion and Order, 2019 WL 1061677 (S.D. W. Va. Mar. 6, 2019).

[27] *Mallory*, ECF Doc. #60, 2019 WL 252530, at *3.

[28] *Mallory*, ECF Doc. #72, 2019 WL 1061677, at *6.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 12

that hemp is produced under the 2014 Farm Bill or under a State, Tribal, or Departmental plan under the 2018 Farm Bill. It is also a final judgment of the Southern District of West Virginia court, and not a preliminary ruling as with the District of Idaho magistrate's opinion.[29]

In matters of statutory interpretation, the text of the statute governs. One must read that text in its entirety and give every word meaning. The reference to "other Federal laws" must be given meaning, and that language clearly refers to the Federal law that currently authorizes the production of hemp — 2014 Farm Bill § 7606. Therefore, hemp produced under that pilot authority is hemp produced in accordance with subtitle G of the AMA. States and Indian tribes may not prohibit the transportation or shipment of such hemp through that State or Tribal territory.

**D.    The 2018 Farm Bill Places Restrictions on the Production of Hemp by Certain Felons.**

The 2018 Farm Bill added a new provision addressing the ability of convicted felons to produce hemp. The 2014 Farm Bill is silent on the issue. AMA § 297B(e)(3)(B) (hereafter, "Felony provision"), as added by the 2018 Farm Bill, provides:

> (B) FELONY.—
>
> (i) IN GENERAL.—Except as provided in clause (ii), any person convicted of a felony relating to a controlled substance under State or Federal law before, on, or after the date of enactment of this subtitle shall be ineligible, during the 10-year period following the date of the conviction—
>
> (I) to participate in the program established under this section or section 297C; and
>
> (II) to produce hemp under any regulations or guidelines issued under section 297D(a).
>
> (ii) EXCEPTION.—Clause (i) shall not apply to any person growing hemp lawfully with a license, registration, or authorization under a pilot program authorized by section 7606 of the Agricultural Act of 2014 (7 U.S.C. 5940) before the date of enactment of this subtitle.

7 U.S.C. § 1639p(e)(3)(B) (emphasis added). The references to "the date of enactment of this subtitle" are to subtitle G of the AMA, as added by section 10113 of 2018 Farm Bill. Therefore, the "date of enactment of this subtitle" is the date of enactment of the 2018 Farm Bill — December 20, 2018.

In explaining the Felony provision, the Conference Report notes:

> Any person convicted of a felony relating to a controlled substance shall be ineligible to participate under the [S]tate or [T]ribal plan for a 10-year period following the date of the conviction. However, this prohibition shall not apply to producers who have been lawfully participating in a [S]tate hemp pilot program as authorized by the Agricultural Act of 2014, prior to enactment of this subtitle. Subsequent felony convictions after the date of enactment of this subtitle will trigger a 10-year

---

[29] *Mallory*, ECF Doc. #72, 2019 WL 1061677, at *9 (denying the United States' motion to amend and granting the defendants' motion to dismiss). *Big Sky*, ECF Doc. #32, at 28 (denying the plaintiff's motion for preliminary injunction and noting that the court will separately issue an order setting a scheduling conference to govern the case going forward).

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE
May 28, 2019
Page 13

> nonparticipation period regardless of whether the producer participated in the pilot program
> authorized in 2014.

H.R. REP. NO. 115-1072, at 737 (2018).

In sum, a person convicted of a State or Federal felony relating to a controlled substance —
regardless of when that conviction occurred — is ineligible to produce hemp under subtitle G of
the AMA for a period of 10 years following the date of the conviction. An exception exists in
clause (ii) of the Felony provision that applies to a person who was lawfully producing hemp
under the 2014 Farm Bill **before December 20, 2018**, and who had been convicted of a felony
relating to a controlled substance before that date. States and Indian tribes now have a
responsibility to determine whether a person wishing to produce hemp in that State or Tribal
territory has any Federal or State felony convictions relating to controlled substances that would
make that person ineligible to produce hemp.

## III.     OTHER ISSUES

There are two additional important aspects of this issue that should be emphasized.

First, the 2018 Farm Bill preserves the authority of States and Indian tribes to enact and enforce
laws regulating the production of hemp that are more stringent than Federal law. *See* AMA
§ 297B(a)(3) (7 U.S.C. § 1639p(a)(3)) ("Nothing in this subsection preempts or limits any law of
a State or Indian tribe that . . . (i) regulates the production of hemp; and (ii) is more stringent than
this subtitle."). For example, a State may continue to prohibit the growth or cultivation of hemp
in that State.[30] As discussed above, however, while a State or Indian tribe may prohibit the
production of hemp, it may not prohibit the interstate shipment of hemp that has been produced
in accordance with Federal law.

Second, the 2018 Farm Bill does not affect or modify the authority of the Secretary of Health and
Human Services ("HHS Secretary") or Commissioner of Food and Drugs ("FDA
Commissioner") under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) and
section 351 of the Public Health Service Act (42 U.S.C. § 262). *See* AMA § 297D(c) (7 U.S.C.
§ 1639r(c)). While AMA § 297D(b) provides that the Secretary of Agriculture shall have "sole
authority" to issue Federal regulations and guidelines that relate to the production of hemp, this
authority is subject to the authority of the HHS Secretary and FDA Commissioner to promulgate
Federal regulations and guidelines under those FDA laws. 7 U.S.C. § 1639r(b).

---

[30] Certain states continue to prohibit the cultivation of hemp. *See* National Conference of State Legislatures, "State
Industrial Hemp Statutes," *available at* http://www.ncsl.org/research/agriculture-and-rural-development/state-
industrial-hemp-statutes.aspx#state (updated Feb. 1, 2019).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

MEMORANDUM FOR THE SECRETARY OF AGRICULTURE.
May 28, 2019
Page 14

## IV.    CONCLUSION

I have analyzed the hemp provisions enacted as part of the 2018 Farm Bill and reach the following conclusions:

1.  As of the enactment of the 2018 Farm Bill on December 20, 2018, hemp has been removed from schedule I of the CSA and is no longer a controlled substance.

2.  After USDA publishes regulations implementing the hemp production provisions of the 2018 Farm Bill contained in subtitle G of the AMA, States and Indian tribes may not prohibit the interstate transportation or shipment of hemp lawfully produced under a State or Tribal plan or under a license issued under the Departmental plan.

3.  States and Indian tribes may not prohibit the interstate transportation or shipment of hemp lawfully produced under the 2014 Farm Bill.

4.  A person with a State or Federal felony conviction relating to a controlled substance is subject to a 10-year ineligibility restriction on producing hemp under subtitle G of the AMA.  An exception applies to a person who was lawfully growing hemp under the 2014 Farm Bill before December 20, 2018, and whose conviction also occurred before that date.

The 2018 Farm Bill preserves the authority of States and Indian tribes to enact and enforce laws regulating the production of hemp that are more stringent than Federal law.  Additionally, the 2018 Farm Bill does not affect or modify the authority of the HHS Secretary or FDA Commissioner to regulate hemp under applicable FDA laws.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356



## South Carolina
# DEPARTMENT OF AGRICULTURE
### CONSUMER PROTECTION DIVISION | HEMP FARMING PROGRAM

Hugh E. Weathers, Commissioner

## <u>South Carolina Hemp Farming State Plan</u>

A Plan to implement the South Carolina Hemp Program under S.C. Code Ann. § 46-55-10 et seq. and the U.S. Hemp Farming Act of 2018.

WHEREAS, under S.C. Code Ann. § 46-55-10 et seq. and the U.S. Hemp Farming Act of 2018, the South Carolina Commissioner of Agriculture is authorized to draft and submit to the Secretary of the U.S. Department of Agriculture a State Plan which sets forth the procedure under which the South Carolina Department of Agriculture regulates hemp production in South Carolina. Pursuant to 7 C.F.R. 990.2, states which seek to have primary authority over the regulation and production of hemp in their home jurisdiction must complete a state plan for review and approval by the United States Department of Agriculture (hereinafter "USDA"). This document serves as the South Carolina Department of Agriculture's (hereinafter the "Department") submission of its State Plan in compliance with 7 C.F.R. 990.2 S.C. Code Ann. § 46-55-10 et seq.

### SECTION 1. SHORT TITLE

This Plan may be cited as the South Carolina Hemp Farming State Plan.

### SECTION 2. PURPOSES

It is the declared policy of this state that hemp is a viable agricultural crop in this state. The purpose of this Plan is to enable the Department and its Permittees to promote the cultivating, handling, and processing of hemp. This State Plan provides a framework for the Department and its Permittees to cultivate, handle, and process hemp in this state.

### SECTION 3. DEFINITIONS

For the purposes of this State Plan:

1. "Acceptable hemp THC level" is the application of the measurement of uncertainty to the reported delta-9 tetrahydrocannabinol content concentration level on a dry weight basis producing a distribution or range that includes 0.3% or less. This definition affects neither the "Federally defined THC level for hemp," as defined below nor, the definition of "marijuana," as defined below. When a laboratory tests a sample, it must report the delta-9 tetrahydrocannabinol content concentration level on a dry weight basis and the measurement

123 Ballard Court • West Columbia, SC 29172                                    AGRICULTURE.SC.GOV

CONSUMER SERVICES      FEED SAFETY      FOOD SAFETY      GRADING & INSPECTION      LABORATORY SERVICES      METROLOGY SERVICES      PRODUCE SAFETY
803-737-9690      803-734-2035      803-737-7321      803-737-4588      803-737-9700      803-253-4052      803-753-7267

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

of uncertainty. The acceptable hemp THC level for the purpose of compliance with the requirements of this State Plan is when the application of the measurement of uncertainty to the reported delta-9 tetrahydrocannabinol content concentration level on a dry weight basis produces a distribution or range that includes 0.3% or less. For example, if the reported delta-9 tetrahydrocannabinol content concentration level on a dry weight basis is 0.35% and the measurement of uncertainty is +/−0.06%, the measured delta-9 tetrahydrocannabinol content concentration level on a dry weight basis for this sample ranges from 0.29% to 0.41%. Because 0.3% is within the distribution or range, the sample is within the acceptable hemp THC level for the purpose of plan compliance.

2.  "Cannabidiol" or "CBD" means the compound by the same name derived from the hemp variety of the Cannabis sativa L. plant.

3.  "Commercial sales" mean the sale of hemp products in the stream of commerce, at retail, wholesale and online.

4.  "Commissioner" is the Commissioner of the South Carolina Department of Agriculture or his designee.

5.  "Conviction" is defined to explain what is considered a conviction and what is not. Specifically, a plea of guilty or nolo contendere or any finding of guilt is a conviction. However, if the finding of guilt is subsequently overturned on appeal, pardoned, or expunged, then it is not considered a conviction for purposes of this State Plan. This definition of "conviction" is consistent with how some other agencies who conduct criminal history record searches determine disqualifying crimes.

6.  "Corrective action plan" means a plan set forth by the Department for a permitted hemp producer to correct a negligent violation of or non-compliance with a hemp production plan, its terms, or any other provision set forth under this State Plan. This term is defined in accordance with the 2018 Farm Bill, which mandates certain non-compliance actions to be addressed through corrective action plans.

7.  "Culpable mental state greater than negligence" is a term used in the 2018 Farm Bill to determine when certain actions would be subject to specific compliance actions. This term means to act intentionally, knowingly, willfully, recklessly, or with criminal negligence.

8.  "Cultivating" means planting, watering, growing, and harvesting a plant or crop.

9.  "Decarboxylated" means the completion of the chemical reaction that converts THC-acid (THCA) into delta-9-THC, the intoxicating component of cannabis. The decarboxylated value is also calculated using a conversion formula that sums delta-9-THC and eighty-seven and seven tenths (87.7) percent of THC-acid.

10. "Decarboxylation" is the removal or elimination of a carboxyl group from a molecule or organic compound.

11. "Department" or "SCDA", as the terms may be used interchangeably, is the South Carolina Department of Agriculture.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

12. "Federally defined THC level for hemp" means a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis, or the THC concentration for hemp defined in the Agriculture Improvement Act of 2018, Pub.L. 115-334, whichever is greater.

13. "Growing Location" or "lot", as the terms may be used interchangeably, refers to a contiguous area in a field, greenhouse, or indoor growing structure containing the same variety or strain of cannabis throughout. In addition, "lot" is a common term in agriculture that refers to the batch or contiguous, homogeneous whole of a product being sold to a single buyer at a single time. Under the terms of this part, "lot" is to be defined by the producer in terms of farm location, field acreage, and variety (i.e., cultivar) and to be reported as such to the FSA.

14. "Handling" means taking ownership, possessing, or storing hemp plants for any period of time. "Handling" also includes possessing or storing hemp plants in a vehicle for any period of time other than during its actual transport from the premises of a permitted person to cultivate or process hemp to the premises of another permitted person. "Handling" does not mean possessing or storing finished Hemp Products as that term is defined below.

15. "Hemp" means the plant species Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. Hemp does not include Hemp Products as defined below.

16. "Hemp Plant Parts" shall mean any floral buds, leaves, roots, seeds, stalks, or stems of the plant Cannabis sativa L. with a THC concentration of not more federally defined THC level for hemp.

17. "Hemp Products" means all products with the federally defined THC level for hemp derived from, or made by, processing hemp plants or hemp plant parts, that are prepared in a form available for commercial sale, including, but not limited to cosmetics, personal care products, food intended for animal or human consumption, cloth, cordage, fiber, fuel, paint, paper, particleboard, plastics, and any product containing one or more hemp-derived cannabinoids, such as cannabidiol. Unprocessed or raw plant material, including non-sterilized hemp seeds, is not considered a hemp product.

18. "Industrial Hemp" is equivalent in all meanings to "Hemp."

19. "Key Participant" means a sole proprietor, a partner in partnership, or a person with executive managerial control in a corporation. A person with executive managerial control includes persons such as a chief executive officer, chief operating officer and chief financial officer. This definition does not include non-executive managers such as farm, field, or shift managers.

20. "Marijuana," as defined under Section 44-53-110 and notwithstanding any other provisions of the law, does not include hemp or hemp products. Cannabis with a THC level exceeding 0.3 percent is considered marijuana, which remains classified as a schedule I controlled substance regulated by the Drug Enforcement Administration (DEA) under the Controlled Substances Act (CSA).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

21. "Negligence" is a term used in the 2018 Farm Bill to describe when certain actions are subject to specific compliance actions. For the purposes of this part, the term means failure to exercise the level of care that a reasonably prudent person would exercise in complying with the regulations set forth under this part.

22. "Permitted Farmer" or "Permitted Hemp Farmer" means an individual permitted to cultivate hemp.

23. "Permitted Handler" or "Permitted Hemp Handler" means an individual or business permitted to handle hemp. A Handler Permit does not allow for cultivation of hemp.

24. "Permitted Processor" or "Permitted Hemp Processor" means an individual or business permitted to process hemp. A Processor Permit does not allow for cultivation of hemp.

25. "Permittee" means a person or business, if applicable, authorized by the Department under the authority of the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. and this State Plan to grow, handle, cultivate, or process hemp. Permitted Farmers, Permitted Handlers, and Permitted Processors are all Permittees.

26. "Processing" means converting an agricultural commodity into a marketable form.

27. "Produce," when used as a verb, is a common agricultural term that is often used synonymously with "grow" and means to propagate plants for market, or for cultivation for market, in the United States. In the context of this part, "produce" refers to the propagation of cannabis to produce hemp. In this State Plan "cultivate" and "farm" when used to refer to the propagation of cannabis to produce hemp shall have the same meaning as produce. The 2018 Farm Bill mandates that USDA maintain a real-time informational database that identifies registered hemp production sites, whether under a State, tribal, or USDA plan, for the purposes of compliance and tracking with law enforcement. AMS will maintain this system with the information collection assistance of FSA. In order to maintain consistency and uniformity of hemp production locations, USDA is recommending that FSA collect this information through their crop acreage reporting system. In this context, a common use of the term "producer" is essential to maintaining a substantive database. For this reason, the definition of "producer" incorporates the FSA definition of "producer" with the additional qualifier that the producer is permitted or authorized to produce hemp under the Hemp Program.

    a. "State Plan" means the plan submitted by the Department and approved by the Secretary of the U.S. Department of Agriculture under which the Department regulates hemp production

28. "Store" is part of the term "handle" as defined above and means to deposit hemp plants or hemp plant product in a storehouse, warehouse or other identified location by a producer for safekeeping prior to delivery to a permitted recipient for further processing.

29. "THC" means tetrahydrocannabinol or Delta-9 tetrahydrocannabinol. THC is the primary intoxicating component of cannabis. Notwithstanding any other provision of the law, the THC that is found in hemp shall not be considered to be THC in qualifying as a controlled substance.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

## SECTION 4. PERMITTING AND FEES

1. Each hemp farmer, processor, or handler shall obtain a permit from SCDA prior to engaging in the regulated activity.

2. No Permittee shall allow any unpermitted person who is not an employee of that Permittee to grow, cultivate, handle, store, process, or transport hemp under his or her Permit.

3. Each Permittee shall be assigned a permit number in the form prescribed by USDA.

4. Permits must be renewed annually.

5. A person applying for multiple permits must complete a permit application and submit the associated fee for each application.

6. Fees

   a. The annual fee for a Hemp Farmer Permit shall be $1,000.

   b. The annual fee for Hemp Processor Permit shall be $3,000.

   c. The annual fee for Hemp Handler Permit shall be up to $1,000.

7. Any persons who materially falsify any information in their application shall be deemed ineligible to participate in the Hemp Farming Program.

8. New permit fees are due upon notification of application approval. No permit shall be issued until payment of the permit fee is received by SCDA.

## SECTION 5. HEMP FARMER PERMIT

1. No person shall grow hemp without first applying for and receiving a Hemp Farmer Permit from SCDA.

2. A Hemp Farmer Permit issued by SCDA shall authorize the Permittee to obtain hemp seed, possess hemp seed for planting, cultivate a hemp crop, harvest hemp plant parts, as well as possess, store, handle, transport, and market plant parts pursuant to this State Plan. A Hemp Farmer Permit does not authorize the Permittee to process hemp.

3. No person under the age of 18 shall be granted a Hemp Farmer Permit under this State Plan.

4. No person shall be eligible to obtain a Hemp Farmer Permit if the applicant:

   a. was convicted of a State or Federal felony related to a controlled substance within the ten years immediately preceding the criminal records report date, which must not be completed more than 60 days before the submission of the application, provided however, that an exception applies to a person who was lawfully growing Hemp under the 2014 Farm Bill before December 20, 2018, and whose Conviction also occurred before that date. If the applicant is an entity all Key Participants of the entity are subject to this requirement;

   b. fails to provide all application requirements and documentation; or

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

    c.   materially falsifies any information contained in the application.

5.   To be eligible to obtain a Hemp Farming Permit, each applicant, at a minimum, must submit the following with prospective Farmer's application:

    a.   The full legal name of the applicant;

    b.   The physical address of the applicant;

    c.   The mailing address of the applicant;

    d.   The email address of the applicant;

    e.   The phone number of the applicant;

    f.   fingerprints, and the appropriate fees, required by the South Carolina Law Enforcement Division (SLED) to perform a fingerprint-based state criminal records check and for the Federal Bureau of Investigation to perform a national fingerprint-based criminal records check; and

    g.   each Growing Location: global positioning coordinates; physical address; maps for each field, greenhouse, building, or storage facility where hemp will be cultivated or stored; and number of outdoor acres, indoor square footage, and number of plants intended to be planted.

6.   For applicants and Key Participants, the Department shall require a state criminal records check, supported by fingerprints, by SLED and a national criminal records check, supported by fingerprints, by the Federal Bureau of Investigation. The results of these criminal records checks must be reported to the Department. SLED is authorized to retain the fingerprints for certification purposes and for notification of the Department regarding criminal charges. No person shall be eligible to obtain a permit if the applicant was convicted of a State or Federal felony related to a controlled substance within the ten years immediately preceding the criminal records report date, which must not be completed more than 60 days before the submission of the application, and who does not meet the felon ban exception set forth above.

## SECTION 6. HEMP PROCESSOR PERMIT

1.   No person shall process hemp plant parts without first applying for and receiving a Hemp Processor Permit from SCDA.

2.   A Hemp Processor Permit issued by SCDA shall authorize the Permittee to possess hemp plant parts, convert hemp plant parts to a Hemp Product, as well as possess, store, handle, transport, and market plant parts pursuant to this State Plan. A Hemp Processor Permit does not authorize the Permittee to cultivate hemp.

3.   No person under the age of 18 shall be granted a Hemp Processor Permit under this State Plan.

4.   No person shall be eligible to obtain a Hemp Processor Permit if the applicant:

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

a. was convicted of a State or Federal felony related to a controlled substance within the ten years immediately preceding the criminal records report date, which must not be completed more than 60 days before the submission of the application, provided however, that an exception applies to a person who was lawfully growing Hemp under the 2014 Farm Bill before December 20, 2018, and whose Conviction also occurred before that date. If the applicant is an entity all Key Participants of the entity are subject to this requirement;

b. fails to provide all application requirements and documentation; or

c. materially falsifies any information contained in the application.

5. To be eligible to obtain a Hemp Processor Permit, each applicant, at a minimum, must submit the following with prospective Processor's application:

a. The full legal name of the applicant;

b. The physical address of the applicant;

c. The mailing address of the applicant;

d. The email address of the applicant;

e. The phone number of the applicant; and

f. fingerprints, and the appropriate fees, required by the South Carolina Law Enforcement Division (SLED) to perform a fingerprint-based state criminal records check and for the Federal Bureau of Investigation to perform a national fingerprint-based criminal records check.

6. For applicants and Key Participants, where applicable, the Department shall require a state criminal records check, supported by fingerprints, by SLED and a national criminal records check, supported by fingerprints, by the Federal Bureau of Investigation. The results of these criminal records checks must be reported to the Department. SLED is authorized to retain the fingerprints for certification purposes and for notification of the Department regarding criminal charges. No person shall be eligible to obtain a permit if the applicant was convicted of a State or Federal felony related to a controlled substance within the ten years immediately preceding the criminal records report date, which must not be completed more than 60 days before the submission of the application, and who does not meet the felon ban exception set forth above.

## SECTION 7. HEMP HANDLER PERMIT

1. No person shall handle hemp plant parts without first applying for and receiving a Hemp Handler Permit from SCDA. Notwithstanding the forgoing, Permitted Hemp Farmers and Permitted Hemp Processors may handle hemp plant parts without possessing a Hemp Handler Permit. A Hemp Handler Permit does not authorize the Permittee to cultivate or process hemp.

2. No person under the age of 18 shall be granted a Hemp Handler Permit under this State Plan.

3. No person shall be eligible to obtain a Hemp Handler Permit if the applicant:

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

a.  was convicted of a State or Federal felony related to a controlled substance within the ten years immediately preceding the criminal records report date, which must not be completed more than 60 days before the submission of the application, provided however, that an exception applies to a person who was lawfully growing Hemp under the 2014 Farm Bill before December 20, 2018, and whose Conviction also occurred before that date. If the applicant is an entity all Key Participants of the entity are subject to this requirement;

b.  fails to provide all application requirements and documentation; or

c.  materially falsifies any information contained in the application.

4.  To be eligible to handle hemp in this state, each applicant, at a minimum, must submit the following with prospective Handler's application:

a.  The full legal name of the applicant;

b.  The physical address of the applicant;

c.  The mailing address of the applicant;

d.  The email address of the applicant;

e.  The phone number of the applicant; and

f.  fingerprints, and the appropriate fees, required by the South Carolina Law Enforcement Division (SLED) to perform a fingerprint-based state criminal records check and for the Federal Bureau of Investigation to perform a national fingerprint-based criminal records check.

5.  For applicants and Key Participants, where applicable, the Department shall require a state criminal records check, supported by fingerprints, by SLED and a national criminal records check, supported by fingerprints, by the Federal Bureau of Investigation. The results of these criminal records checks must be reported to the Department. SLED is authorized to retain the fingerprints for certification purposes and for notification of the Department regarding criminal charges. No person shall be eligible to obtain a permit if the applicant was convicted of a State or Federal felony related to a controlled substance within the ten years immediately preceding the criminal records report date, which must not be completed more than 60 days before the submission of the application, and who does not meet the felon ban exception set forth above.

## SECTION 8. PRODUCER AND LAND INFORMATION TO USDA

1.  USDA requires that the Department collect, maintain and report to USDA contact and real-time information for each hemp producer[1] licensed or authorized in the state regarding:

a.  Contact information including at minimum the full name of the individual, permit or authorization identifier, business address, telephone number, and email address (if

---

[1] USDA regulations 990. I defines "producer" as a producer as defined in 7 CFR 718.2 that is licensed or authorized to produce hemp under this part. South Carolina's analogous term is "Hemp Farmer" or " Permitted Hemp Farmer."

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

available). If the producer is a business entity, the information must include the full name of the business, address of the principal business location, full name and title of the Key Participants, an email address if available, and EIN number of the business entity.

b.  A legal description of the land on which the producer will produce hemp in the State or territory of the Indian Tribe including, to the extent practicable, its geospatial location; and

c.  The status and number of the producer's license or authorization.

2.  To comply with this, the Department requires the following:

a.  The Department requires that prospective Hemp Farmers first apply for a permit with the Department using the Department's online database program. This program will allow the Department to transmit information regarding its Permittees to USDA upon request. Additionally, the Department shall provide USDA, by the first of each month, a report which includes all contact information, legal description of all land on which Permitted Farmers are authorized to produce hemp, and the status of each Permitted Farmers' Permit.

b.  The Department shall include the following contact information in the report referenced in the paragraph above:

i.  For each prospective Hemp Farmer who is an individual and is permitted or authorized by the Department, the report shall include the full name of the individual, permit or authorization identifier, business or farm address, telephone number, and email address, if the email address is available.

ii.  For each new Hemp Farmer that is an entity[2] and is permitted or authorized by the Department, the report shall include full name of the entity, the principal business location address, license or authorization identifier, EIN number of the business entity and the full name, title, and email address (if available) of each employee for whom the entity is required to submit a criminal history record report.

c.  The Department requires each prospective Hemp Farmer to provide the following information for each growing location upon application and annually: global positioning coordinates; physical address; maps for each field, greenhouse, building, or storage facility where hemp will be cultivated or stored; and number of outdoor acres, indoor square footage, and number of plants intended to be planted.

d.  The Department, through its online database program, will have the capability to submit the required reports to USDA on a timely basis. As stated above, the Department shall provide to USDA, by the first of each month, a report which includes all contact

---

[2] At the time of submission of this Plan, the Department does not offer Farmer Permits to entities any only permits individuals. The Department anticipates that in future growing years, it will open the Farmer Permits to entities, and in that event the provisions set forth in this section will apply.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

information for Permitted Farmers, legal description of all land on which Permitted Farmers are authorized to produce hemp, and the status of each Permitted Farmers' Permit.

e.   The Department shall utilize the Hemp Producer Report on forms supplied by the Department to meet this requirement.

## SECTION 9. ACCURATE AND EFFECTIVE SAMPLING

1.   USDA requires that this State Plan must include a procedure for accurate and effective sampling of all hemp produced, to include the following requirements:

a.   Within thirty (30) days prior to the anticipated harvest of cannabis plants, a Federal, State, local, or Tribal law enforcement agency or other Federal, State, or Tribal designated person shall collect samples from the flower material from such cannabis plants for delta-9 tetrahydrocannabinol concentration level testing.

b.   The method used for sampling from the flower material of the cannabis plant must be sufficient at a confidence level of 95 percent that no more than one percent (1%) of the plants in the lot would exceed the acceptable hemp THC level. The method used for sampling must ensure that a representative sample is collected that represents a homogeneous composition of the lot.

c.   During a scheduled sample collection, the producer or an authorized representative of the producer shall be present at the growing site.

d.   Representatives of the sampling agency shall be provided with complete and unrestricted access during business hours to all hemp and other cannabis plants, whether growing or harvested, and all land, buildings, and other structures used for the cultivation, handling, and storage of all hemp and other cannabis plants, and all locations listed in the producer license.

e.   A producer shall not harvest the cannabis crop prior to samples being taken.

2.   To comply with this, the Department requires the following:

a.   Hemp Farmers must comply with the Department's sampling procedures which mirror the Standard Sampling Method set forth in the "Sampling Guidelines for Hemp U.S. Domestic Hemp Production Program" document issued January 15, 2021 by USDA and attached to this State Plan as Appendix 1.

b.   All hemp producers are subject to annual inspection and sampling conducted by the Department to verify that plants do not exceed acceptable federally defined THC level for hemp.

c.   Representatives of the Department shall be provided with complete and unrestricted access to all hemp and other cannabis plants, whether growing or harvested, and all land, buildings, and other structures used for the cultivation, handling, and storage of all

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

hemp and other cannabis plants; and all growing locations on record for the Permitted Hemp Farmer's permit.

d.  The Department's inspectors or an authorized agent shall collect a minimum of two samples from each variety planted per growing location during the growing season and before harvest to ensure compliance with the federally defined THC level for hemp. The number of samples collected from each variety shall be determined using the formula set forth in the "Sampling Guidelines for Hemp U.S. Domestic Hemp Production Program" document issued January 15, 2021 by USDA and attached to this State Plan as Appendix 1, but in no event shall be less than two samples from each variety.

e.  In addition to the annual inspection and sampling referenced in this Section, above, the Commissioner or his authorized agent(s) shall have access, during normal working hours, to any premises where there is reason to believe that hemp plants or plant parts are transported, produced, cultivated, and/or stored for the purpose of inspection, investigation, and/or collection of samples for testing. The Commissioner or his authorized agent(s) may inspect any hemp seed, plant, or plant parts located on the premises. SCDA shall not charge a testing fee for samples collected pursuant to an investigation initiated by SCDA.

f.  SCDA will also conduct annual inspections of a random sample of Permittees to verify that hemp is not being produced in violation of this State Plan.

g.  If a hemp producer voluntarily surrenders any permit, the Department may exercise its discretion to inspect and sample any permitted area during normal business hours without advance notice prior to accepting the surrender.

h.  The Department may require the Permitted Farmer or the Permitted Farmer's authorized representative to be present during an inspection to provide the Department's inspector with complete and unrestricted access during business hours to all hemp and/or cannabis plants, parts and seeds within a permitted area whether growing or harvested, and all land, buildings and other structures used for the cultivation and storage of hemp. During a scheduled sample collection, the Permitted Farmer or the Permitted Farmer's authorized representative shall be present at the growing site.

i.  The Department may require access to and copies of all documents and records pertaining to the Hemp Farmer's business at any time. Such records shall be promptly produced, ample time for review shall be provided, and copies may be made during time of inspection.

j.  Individual samples of each variety of hemp may be sampled from the permitted area at the Department's discretion.

k.  The method used for sampling from the flower material of the cannabis plant must be sufficient at a confidence level of 95 percent that no more than one percent (1%) of the plants in the lot would exceed the federally defined THC level for hemp. The method

11

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

used for sampling must ensure that a representative sample is collected that represents a homogeneous composition of the lot.

l.   The Department or an authorized agent shall collect samples from the flower material within thirty (30) days prior to the anticipated harvest of cannabis plants. The Permitted Farmer must notify the Department of its intended harvest date at least thirty days in advance. This window provides the Department's inspectors the time needed to visit the growing location to collect the samples

m.   A Hemp Farmer shall not harvest the hemp crop prior to samples being taken from the area intended to be harvested.

n.   Samples of hemp plant material from different lots shall not be commingled with hemp plant material from other lots.

o.   The Department shall take samples from each field, greenhouse, building, or site where hemp is being cultivated by the Permittee. The samples shall consist of cuttings from at least two hemp plants per growing location and per variety. The hemp plants selected for sampling shall be determined by the Department and not the Hemp Farmer.

p.   For the annual sampling to occur prior to harvest referenced in this Section, the Department may charge a sampling fee not to exceed $100 per sample collected, plus the actual cost of shipping and handling.

## SECTION 10. ACCURATE AND EFFECTIVE TESTING

1.   USDA requires that this State Plan must include a procedure for testing that is able to accurately identify whether the sample contains a delta-9 tetrahydrocannabinol content concentration level that exceeds the acceptable hemp THC level, to include the following:

a.   Laboratories conducting hemp testing must be DEA-registered as conducting these tests could potentially require handling of material (cannabis) above the 0.3% concentration of THC (dry weight basis) thus constituting marijuana as defined in 7 USC § 1639o(1), a Schedule I controlled substance. Notwithstanding the forgoing, because there are an insufficient number of DEA-registered laboratories to test all the anticipated hemp that will be produced in 2020 and possibly 2021, DEA has agreed to extend the enforcement flexibility allowing non-DEA registered labs to test hemp until January 1, 2022 and is processing lab registration applications quickly to get more labs testing hemp DEA-registered. Therefore, laborites that are not DEA- registered may be used until January 1, 2022.

b.   Test procedures must utilize validated post-decarboxylation or similarly reliable analytical methodology that provides total THC concentrations accounting for the conversion of delta-9-tetrahydrocannabinolic acid (THCA) into THC.

c.   Testing methodologies meeting the requirements of this Section 10.1  include, but are not limited to, gas or liquid chromatography with detection. The total THC concentration level shall be determined and reported on a dry weight basis.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

    d. Selection of methodology for the purpose of determining concentrations of total THC should consider guidance provided in the AOAC Standard Method Performance Requirements (Appendix F, AOAC Official Methods of Analysis). For this State Plan, methodology shall meet the following criteria:

        i. The validity and reliability of test results must be demonstrated through evidence of a laboratory quality assurance program or laboratory accreditation, including that meeting ANSI/ISO 17025:2017;

        ii. Analytical method selection, validation, and verification must ensure that the testing method used is appropriate (fit for purpose), and that the laboratory can successfully perform the testing;

        iii. The demonstration of testing validity must ensure consistent, accurate analytical performance;

        iv. Method performance specifications must ensure analytical tests are sufficiently sensitive and selective for the purposes of the detectability requirements of this part; and

        v. Measurement of uncertainty (MU) must be estimated and reported with test results. Laboratories shall use appropriate, validated methods and procedures for all testing activities and evaluate measurement of uncertainty in accordance with Joint Committee for Guides in Metrology 100:800, Evaluation of measurement Data – Guide to the Expression of Uncertainty in Measurement and NIST Technical Note 1297: Guidelines for Evaluating and Expressing the Uncertainty of NIST Measurement Results.

2. Any test of a representative sample resulting in higher than the acceptable hemp THC level shall be conclusive evidence that the lot represented by the sample is not in compliance with this part. Lots tested and not certified by the DEA-registered laboratory at or below the acceptable hemp THC level may not be further handled, processed or enter the stream of commerce and the producer shall ensure the lot is disposed of in accordance with the federal guidelines set forth by USDA in § 990.27 of its Final Rule.

3. To comply with this, the Department requires the following:

    a. Quantitative determination of THC levels measured gas or liquid chromatography with detection.

    b. The testing methodology shall consider the potential conversion of THC-A in hemp into THC and the test result shall measure the total available THC derived from the sum of the THC and THC-A content. Appropriately, the THC-A result will be modified by the molecular weight conversion factor 0.877 prior to summation with THC. The total THC concentration level shall be reported on a dry weight basis.

    c. Analytical testing for purposes of detecting the concentration levels of THC shall meet the following standards:

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

    i.   Laboratory must be DEA registered, subject to the exception set forth above in Section 10.1.a;

    ii.   laboratory quality assurance must ensure the validity and reliability of test results;

    iii.   analytical method selection, validation, and verification must ensure that the testing method used is appropriate (fit for purpose), and that the laboratory can successfully perform the testing;

    iv.   the demonstration of testing validity must ensure consistent, accurate analytical performance;

    v.   method performance specifications must ensure analytical tests are sufficiently sensitive for the purposes of detectability requirements of this Section;

    vi.   an effective disposal procedure in accordance with DEA regulations for samples of hemp plants and hemp plant parts that do not meet the requirements federally defined THC level for hemp or this Section; and

    vii.   the measurement of uncertainty shall be estimated and reported with the results.

d.   The results of the THC analysis shall be reported to the Permittee and, if tested by an approved third-party laboratory, to the Department.

e.   Samples with a THC concentration that do not exceed the acceptable hemp THC level shall be issued a certificate of analysis and require no further action. The lot or harvested plant material from which the sample was obtained shall be released for marketing or further processing.

f.   Samples that exceed the acceptable hemp THC level shall be reported by the Department to the Permittee and the Permittee may request a resample and retest of the lot or harvested plant material. If no request is made within 10 days of the sample results being reported to the Permittee, then the lot or harvested plant material from which the sample was taken shall be subject to disposal and destruction as set forth in Section 11 below.

g.   No hemp plants or plant parts for which a THC analysis is pending shall be transferred, transported, sold, marketed, or otherwise disposed of until approved by the Department.

h.   The Permittee shall be responsible for all sample testing fees.

## SECTION 11. DISPOSAL PROCEDURES

1.   USDA requires that this State Plan must include an effective disposal procedure for hemp plants that are produced under this State Plan and that do not meet the requirements set forth by USDA and set forth within this State Plan. USDA producers are required to follow procedures for ensuring effective disposal of cannabis plants produced in violation of this rule.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

2. To comply with this, the Department requires the following: All hemp plants and plant material resulting from a lot or harvested plant material represented by a sample with a THC concentration greater than the Federally defined THC level for hemp shall be disposed of in accordance with the on-farm disposal options described herein and prohibited from being further handled, processed, or entering the stream of commerce.

   a. All Permitted Hemp Farmers must submit, and the Department must approve a destruction plan prior to destruction.

   b. Permitted Hemp Farmers notified they have produced cannabis plants exceeding the acceptable hemp THC level must arrange for either disposal or remediation of the lot represented by the sample.

   c. Disposal methods must be in accordance with the procedures as specified above and described in the "Remediation and Disposal Guidelines for Hemp Growing Facilities U.S. Domestic Hemp Production Program" document issued January 15, 2021 by USDA and attached to this State Plan as Appendix 2.

   d. Remediation activities include disposing of flower materials and salvaging the remainder of the plant or blending the entire plant into biomass plant material. Through both forms of remediation, producers may be able to minimize losses, and in some cases produce a return on investment while ensuring that non-compliant material does not enter commerce. If a Permitted Hemp Farmer elects to perform remediation activities as allowable under this State Plan's provisions (referenced above), an additional sampling and testing of the post-remediated crop must occur to determine THC concentration levels. Only those successfully remediated crops, meaning crops that test at or below Federally defined THC level for hemp, will be allowed to enter the stream of commerce, and all other remaining non-compliant crops must then be disposed.

   e. No destruction may occur unless Department personnel are present to witness the destruction unless otherwise set forth by an exception in writing by the Department.

   f. Permitted Hemp Farmers must document the disposal or remediation of all non-compliant cannabis. This can be accomplished by providing USDA with a copy of the documentation of disposal or remediation using the reporting requirements established by USDA. These reports must be submitted to USDA following the completion of the disposal or remediation process.

   g. All hemp plants and plant materials produced in violation of this State Plan may be subject to destruction as set forth in this Section.

## SECTION 12. USDA REPORTING AND RECORDKEEPING

1. USDA requires that this State Plan must include a procedure for the prompt notification of the AMS Administrator by certified mail or electronically of any occurrence of cannabis plants or plant material that do not meet the definition of hemp set forth by USDA and in this State Plan and attach the records demonstrating the appropriate disposal of all of those plants and materials in the lot from which the representative samples were taken.

15

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

2. To comply with this, the Department requires the following:

   a. SCDA shall submit to USDA a report notifying USDA of any occurrence hemp plants or plant material that exceed the Federally defined THC level for hemp by the first of each month. If the first of the month falls on a weekend or holiday, the report is due by the first business day following the due date. The report shall be submitted using a digital format compatible with USDA's information sharing systems, whenever possible. If digital transmission is used, the report will be sent by certified mail. The report shall contain the following information:

      i. The name and address of the Permitted Hemp Farmer;

      ii. Permit number;

      iii. Location information, such as lot number, location type, and GPS or other location descriptor for the production area subject disposal;

      iv. Information on the agent handling the disposal; Disposal completion date;

      v. Total acreage;

      vi. Laboratory test results;

      vii. Business address of Permittee;

      viii. Lot identification number for the sample;

      ix. Name and DEA registration number of laboratory;

      x. Date of test and report;

      xi. Identification of retest, if applicable; and

      xii. Test result.

   b. SCDA shall submit an annual Report to USDA, using a digital format compatible with USDA's information sharing systems, whenever possible, by the end of the year and the report shall contain the following information:

      i. Total planted acreage;

      ii. Total harvested acreage;

      iii. Total acreage disposed.

3. Records

   a. All Permittees shall maintain, at a minimum, the following records, where applicable:

      i. For Permitted Hemp Farmers, all records for crop production and crop destruction;

      ii. Documentation of any sales or distribution, including the party to which all product was sold or distributed;

16

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

iii. For Permitted Hemp Farmers, documentation of traceability from seed acquisition to harvest or crop termination; and

iv. For Permitted Hemp Processors, documentation of hemp acquisition from grower to their final product.

v. For Permitted Hemp Handlers transporting or delivering hemp including, but not limited to, contract carriers, shall have a dated invoice, bill of lading, or manifest in his or her possession during the entire time of transport or delivery, which shall include:

1. The seller's and purchaser's name and address;

2. The specific origin and destination of the hemp being transported; and

3. The quantity of hemp being transported.

b. All records required under this Section shall be maintained by the Permittee while the permit is valid and for a minimum of 3 years after the expiration of the permit. Because this State Plan allows Permitted Hemp Farmers to remediate plants, the Final Rule also requires producers to maintain records on all remediated cannabis plants.

c. Required records shall be provided for inspection within 48 hours upon request by SCDA.

**SECTION 13. REQUIREMENTS FOR PERMITTED HEMP FARMERS**

1. Permitted Hemp Farmers may not cultivate or store hemp or hemp plant parts unless the location where the hemp is to be cultivated or stored is on record prior to hemp being brought on site. In the Hemp Farmer Application, the Farmer will provide for each Growing Location the following: global positioning coordinates; physical address; maps for each field, greenhouse, building, or storage facility where hemp will be cultivated or stored; and number of outdoor acres, indoor square footage, and number of plants intended to be planted.

2. Permitted Hemp Farmers alter the approved Growing Location(s) and/or storage areas set forth in the application if:

a. At least 14 days prior to the proposed modification, the hemp producer shall:

b. Submit a Site Modification Request on forms provided by the Department, which includes, at minimum: global positioning coordinates; physical address; maps for each field, greenhouse, building, or storage facility where hemp will be cultivated or stored; and number of outdoor acres, indoor square footage, and number of plants intended to be planted.

c. Pay a site modification fee of $150. The fee shall not apply to storage-only sites, but the Department must approve such storage sites prior to use. In the event the site modification is not approved, this fee will be refunded.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

3. Permitted Hemp Farmers shall report hemp crop acreage or square footage to the USDA Farm Service Agency and shall provide, at a minimum, the following information:

    a. Street address and, to the extent practicable, GPS location for each field, greenhouse, or indoor growing structure where hemp will be cultivated;

    b. Acreage or square footage for each field, greenhouse, or indoor growing structure dedicated to the cultivation of hemp; and

    c. SCDA Hemp Farmer Permit number.

4. Permitted Hemp Farmers shall post a sign at each field, greenhouse, or indoor growing structure. The sign shall comply with the following requirements and remain posted during the entire crop cycle:

    a. It shall include the following:

        i. The designation, "South Carolina Hemp Farming Program";

        ii. The Hemp Farmer's Permit number; and

        iii. SCDA Hemp Farming Program's telephone number.

    b. Minimum sign size shall be 18" x 24" for a field and 8.5" x 11" for a greenhouse or indoor growing structure;

    c. The sign shall be posted at each field, greenhouse, or indoor growing structure; and

    d. The sign shall be printed and conform to the design template provided to each Permitted Hemp Farmer by SCDA.

5. Permitted Hemp Farmers shall submit in writing a completed planting report on forms provided by the Department for each field, greenhouse, or indoor growing structure within 15 days commencing after the first day of the planting of hemp. The completed planting report shall include, but not limited to, the Permittee's USDA Farm Service Agency site identification number.

    a. Permitted Hemp Farmers shall submit in writing a completed planting report to SCDA for each greenhouse or indoor growing structure by March 31, June 30, September 30, and December 31 of each year after the initial planting.

    b. If a field or other outdoor growing location on record with SCDA is not planted by July 31, Permitted Hemp Farmers shall submit in writing a completed "No Plant" report on forms provided by the Department.

6. Permitted Hemp Farmers submit in writing a completed Harvest/Destruction report to SCDA prior to the intended harvest date or intended destruction date of a failed crop.

7. A Permitted Hemp Farmer who fails to timely submit a Harvest/Destruction Report or who harvests a crop prior to a sample being collected by SCDA may be subject to crop destruction and regulatory action up to and including permit suspension or revocation.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

8. Permitted Hemp Farmers shall monitor and destroy volunteer hemp plants from the Permittee's cultivation for a period of three years after cultivation ends.

## SECTION 14. LAND USE RESTRICTIONS

1. A Permitted Hemp Farmer shall not grow, handle, store hemp in any structure that is used for residential or retail purposes.

2. A Permitted Hemp Farmer or Processor shall not grow, handle, process or store hemp in any outdoor field or site that is located within 1,000 feet of a school, daycare, park or similar public areas frequented by children as determined by SCDA.

3. An applicant may not apply for a permit to grow, cultivate, handle, or process hemp on property that is not owned or leased by that applicant.

## SECTION 15. RESTRICTIONS ON SALE OR TRANSFER

1. A Permittee shall not sell or transfer or permit the sale or transfer of living hemp plants, viable plant parts, or non-sterilized (viable) seeds to any person in the state who does not hold a Hemp Farming Permit issued by SCDA.

2. Notwithstanding the forgoing, Permittees may transfer up to one pound of hemp plants or plant part or two pounds of non-sterilized, viable seed per transfer to testing laboratories, both within and outside the state for the purpose of measuring THC, CBD, or other phytocannabinoid profile levels.

3. When transferring outside of the state, it is the responsibility of the Permittee to ensure compliance with laws in other states.

4. A Permittee shall not store or cultivate live hemp plants or propagating stock at any location that was not previously approved by SCDA on that Permittee's application and/or site modification request on forms provided by the Department

## SECTION 16. PROHIBITIONS

1. No person shall:

   a. Sell, offer for sale, expose, distribute or transport hemp or hemp seed not produced in accordance with the provisions of this State Plan;

   b. Fail to comply with sample collection, and testing requirements prior to harvesting or destroying any hemp plants or plant parts in accordance with this State Plan;

   c. Detach, alter, deface, or destroy any required documentation specified in this State Plan;

   d. Alter, substitute, or misrepresent seed in a manner inconsistent with this Sate Plan;

   e. Hinder or obstruct in any way any authorized agent(s) of SCDA in the performance of their duties;

19

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

f.   Fail to comply with all permitting and reporting requirements set forth in the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan;

g.   Fail to keep required records as set forth in this State Plan or to provide such records to SCDA for inspection upon request;

h.   Fail to monitor and/or destroy volunteer hemp plants for three years following cultivation as set forth in this State Plan;

i.   Provide false, misleading, or incorrect information to SCDA pertaining to the cultivation, processing, storage or transportation of hemp including, but not limited to, information provided in any application, report, record, or inspection required or maintained in accordance with the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan;

j.   Plant, grow, store, transfer, or process hemp on any site not on record with the SCDA as set forth in this State Plan;

k.   Sell or transfer, or permit the sale or transfer of living hemp plants or plant parts to any person in the state who does not hold a Hemp Farming Permit issued by SCDA; or

l.   Commingle harvested hemp plant parts from one lot with harvested hemp plant parts from another lot.

## SECTION 17. ENFORCEMENT

1.   Adjudicatory Proceedings; Violations

a.   The Commissioner may suspend or revoke any permit issued under the provisions of the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan.

b.   Whenever the Commissioner has reason to believe that a Permittee has violated any provision of the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan, the Commissioner shall notify the Permittee of the alleged violation as well as an opportunity to respond thereto, by certified mail, prior to any scheduled hearing date.

c.   Each separate day on which any violation occurs may be considered a separate violation.

d.   No penalty may be assessed, nor may any permit be suspended or revoked by the Commissioner prior to the holding of an adjudicatory hearing before the commissioner.

e.   Such adjudicatory hearing shall be conducted in accordance with the requirements of the South Carolina Administrative Procedure Act; any person alleged to have violated any provision of the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan, shall be accorded all rights and privileges under said Act.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

f.  The Department shall make an initial determination on alleged violations and recommend findings of fact and conclusions of law together with penalties, if applicable, in writing.

g.  The Commissioner shall make the final determination on the disposition of alleged violations. If the Commissioner does not accept the recommendations of the Department following an adjudicatory proceeding, the Commissioner shall notify the Department, in writing, of the reasons for not accepting the Department's recommendations.

h.  Reinstatement of a revoked permit shall be by hearing before the Department and approval of the Commissioner.

2.  Appeals

a.  An applicant for a hemp permit may appeal a permit denial to the South Carolina Commissioner of Agriculture or his or her designee. Permittees may appeal denials of permit renewals, permit suspensions, or permit revocations. All appeals must be submitted in writing and received within thirty days of the denial, suspension, or revocation. This submission deadline should provide adequate time to prepare the necessary information required to formulate the appeal. An appeal must explain the reasoning behind the appeal, e.g. why the Department's decision is not justified or is improper. The appeal should include any additional information or documentation the Permittee believes the Department should consider when reviewing its decision. The Department will take into account the Permittee's justification for why the permit should not be denied, suspended, or revoked, and then issue a final determination. Determinations made by the Department under the appeals process will be final.

3.  Corrective Action Plan for Negligent Violations and Mandatory Reporting

a.  In addition to being subject to permit suspension, permit revocation, and civil penalties, a person who is found by SCDA to have negligently committed the following violations may be subject to a corrective action plan:

    i.  Failing to provide a legal description of the field, greenhouse, indoor growing structure, or site where hemp will be cultivated, handled, or stored prior to bringing hemp or hemp parts onto said field, greenhouse, indoor growing structure, or site;

    ii.  Failing to obtain a Farmer, Processor, or Handler Permit from SCDA prior to engaging in the respective restricted activity; or

    iii.  Producing hemp exceeding the acceptable hemp THC level. Notwithstanding the forgoing, a person that has made reasonable efforts to grow hemp and produces hemp of containing at or less than one (1) percent THC on a dry weight basis shall not be deemed to have committed a negligent violation.

b.  A corrective action plan issued by SCDA shall include the following information:

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

    i.   A reasonable date by which the person shall correct the negligent violation; and

    ii.   A requirement that the person shall periodically report to SCDA about the person's compliance with the corrective action plan, the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq., and this State Plan for a period of at least two years from the date of the negligent violation.

    iii.   SCDA shall conduct periodic inspections to determine if the corrective action plan has been implemented as submitted.

    iv.   A person who is found by SCDA to have negligently violated the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan three times in a five-year period shall be ineligible to hold a hemp farming, processor, or handler permit for a period of five years beginning on the date of the third violation. Notwithstanding the forgoing, a person shall not be subject to more than one negligent violation per calendar year.

    v.   A person that has negligently violated the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan shall not be reported to local, state, or federal government authorities for criminal enforcement action. However, notwithstanding the forgoing, SCDA has an obligation to respond fully and accurately to any independent requests for information that SCDA receives from local, state, or federal government authorities.

4. If the Commissioner determines that a Permittee has willfully violated state law with a culpable mental state greater than negligence, the Commissioner shall immediately report

5. A person believed to be in violation of the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. or this State Plan may be issued a written or verbal stop order by SCDA. Stop orders shall be effective immediately upon notification to the alleged violator.

    a.   If an alleged violator refuses to accept a written stop order when tendered or refuses or fails to claim such stop order when sent by certified mail, the stop order shall be deemed to have been delivered to the alleged violator.

    b.   Refusal or failure to abide by the terms of a stop order shall constitute a willful violation of this State Plan.

## SECTION 18. FUNDING

The Department has sufficient resources and personnel to carry out this Plan.

The Department is authorized by the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. to charge application, permit, and renewal of permit fees reasonably calculated by the Department to pay the cost of administering the South Carolina Hemp Program. As set forth in South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq., monies from fees collected under the Hemp Farming Program shall be continuously appropriated to the Department for purposes of carrying out the duties of the South Carolina Hemp Farming Program.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

## SECTION 19. HEMP PRODUCTS

The enforcement and permitting scheme outlined in the South Carolina Hemp Farming Act S.C. Code Ann. § 46-55-10 et seq. shall not apply to the possession, handling, transport or sale of hemp products as defined herein, including those containing hemp-derived cannabinoids, including CBD.

## SECTION 20. UNLAWFUL CONDUCT RELATING TO MARIJUANA IN PROXIMITY TO HEMP; PENALTIES

An individual who manufactures, distributes, dispenses, delivers, purchases, aids, abets, attempts, or conspires to manufacture, distribute, dispense, deliver, or purchase, or possesses with the intent to manufacture, distribute, dispense, deliver, or purchase marijuana, in a manner intended to disguise the marijuana due to its proximity to hemp, does so in violation of the State Plan. Penalties provided for in this State Plan may be imposed in addition to any other penalties provided by law.

## SECTION 21. INTERSTATE COMMERCE

Nothing in this rule prohibits the interstate commerce of hemp. No State or Indian Tribe may prohibit the transportation or shipment of hemp produced in accordance with this State Plan and with section 2018 Farm Bill through the State or the territory of the Indian Tribe, as applicable.

## SECTION 22. SEVERABILITY

This State Plan includes a severability provision. This section provides that if any provision of this State Plan is found to be invalid, the remainder of the State Plan shall not be affected.

23

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

**APPENDIX 1**

**Sampling Guidelines for Hemp**

**U.S. Domestic Hemp Production Program**

**Issued January 15, 2021**

**PURPOSE:**

1. Standard and Performance-based sampling guidelines are specified for field and indoor sampling of hemp.  States and Tribes shall develop their own sampling protocols in accordance with §990.3.

2. Samples are taken to obtain specimens for the measurement of total tetrahydrocannabinol (THC) content, which determine whether the specimens are hemp or marijuana. The measurements are intended to be representative of the total THC content in a "lot" of hemp crop acreage as identified by the producer. Hemp producers may not harvest hemp prior to the hemp being sampled for THC concentration. Testing procedures are provided in a separate guidance document.

**SCOPE:**

1. Samples collected under this procedure are acceptable for submission to a qualified testing laboratory for determination of total THC concentration in hemp. After December 31, 2022, all laboratories testing hemp under the U.S. Domestic Hemp Production Program must be registered with the DEA in accordance with §990.3(a)(3)(iii)(H) and §990.25(g)(iii).

2. Since the THC content of hemp generally peaks as the plant ripens, the timing of when sampling occurs is important to accurately measure total THC concentration and monitor compliance with the USDA hemp production program. Harvest shall be completed within 30 days from sample collection.

3. Samples shall be collected only by a trained sampling agent. Sampling agents must be trained under applicable USDA, State, or Tribal training procedures. States and Tribes must maintain information, available to producers, about trained sampling agents. Hemp producers may not act as sampling agents.

4. It is the responsibility of the licensed producer to pay any fees associated with sampling.

5. It is the responsibility of the sampling agent to pay any fees associated with sampling agent training or testing.

**SUMMARY OF PRACTICE:**

1. This practice provides procedures for entering a growing area and collecting the minimum number of plant specimens necessary to represent a homogeneous composition of the "lot" that is to be sampled. A trained sampling agent enters a growing area, strategically examines the

24

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

growing area, establishes an approach for navigating the growing area, and collects individual specimens of plants in order to obtain a representative sample of hemp in the designated lot.

2. Cuttings from each "lot" of hemp crop acreage, as identified by the producer, and submitted to and uniquely identified by the Farm Service Agency (FSA) per the requirements of the USDA hemp production program, shall be organized as composite samples. The terminology used by FSA to denote land areas include terms like "farm," "tract," "field," and "subfield," which are equivalent to AMS's term "lot." For the purposes of these procedures, a "lot" is a contiguous area in a field, greenhouse, or indoor growing structure containing the same variety or strain of cannabis throughout. In addition, "lot" refers to the batch of contiguous, homogeneous whole of a product being sold to a single buyer at a single time. The size of the "Lot" is determined by the producer in terms of farm location and field acreage and is to be reported as such to the FSA.

**PERFORMANCE-BASED SAMPLING PROTOCOLS:**

1. States and Tribes may develop performance-based sampling protocols.

2. Performance-based sampling protocols may consider seed certification processes, other process that identify varieties that have consistently resulted in compliant hemp plants, whether the producer is conducting research on hemp at an institution of higher learning or that is funded by a Federal, State, or Tribal government, whether a producer has consistently produced compliant hemp plants over an extended period of time, and other similar factors.

3. Performance-based sampling protocols may consider alternative requirements for operations that grow "immature" cannabis that does not reach the flowering stage. These facilities may grow seedlings, clones, microgreens, or other non-flowering cannabis, as determined by the State or Tribe.

4. A performance-based sampling protocol must have the potential to ensure, at a confidence level of 95 percent, that the cannabis plants will not test above the acceptable hemp THC level of 0.3 percent on a dry weight basis.

5. Regardless of the specific performance-based sampling requirements developed under a State or Tribal plan, all samples must be collected from the flowering tops of the plant by cutting the top five to eight inches from the "main stem" (that includes the leaves and flowers), "terminal bud" (that occurs at the end of a stem), "or "central cola" (cut stem that could develop into a bud) of the flowering top of the plant.

6. States and Tribes are required to include performance-based sampling protocols in the plan submitted to USDA for approval if they decide to use this methodology.

**STANDARD SAMPLING PROTOCOLS:**

1. The standard sampling method must be used by all producers, except for producers operating under a State or Tribal plan that includes a performance-based sampling requirement.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

2. The standard sampling protocol ensures, at a confidence level of 95 percent, that no more than one percent of the plants in each lot would exceed the acceptable hemp THC level and ensures that a collected sample represents a homogeneous composition of the lot.

3. Every lot and every producer must be sampled and tested.

4. All samples must be collected from the flowering tops of the plant by cutting the top five to eight inches from the "main stem" (that includes the leaves and flowers), "terminal bud" (that occurs at the end of a stem), "or "central cola" (cut stem that could develop into a bud) of the flowering top of the plant.

5. All producers licensed directly by USDA are subject to these requirements.

**EQUIPMENT AND SUPPLIES:**

1. Garden pruners/shears (Cleaned prior to and following each composite sample. Some examples of appropriate cleaning agents and supplies to use on garden pruners/shears are bleach, rubbing alcohol, steel wool, and/or sandpaper.)

2. Sample bags, paper.

   a. The size of the bags will depend upon the number of clippings collected per lot.

   b. The bags should be made from material known to be free from THC.

3. Security tape

4. Permanent markers

5. Sample collection forms

6. GPS Unit of lot being sampled

7. Disposable gloves – Nitrile

8. Ladder

**SAMPLING GUIDELINES:**

1. The licensee or designated employee should be present throughout the sampling process, if possible.

2. Surveillance of the growing area.

   a. The sampling agent should estimate the average height, appearance, approximate density, condition of the plants, and degree of maturity of the inflorescences (flowers/buds).

   b. The sampling agent should visually establish the homogeneity of the stand to establish that the growing area is of like variety.

3. Time of Sampling:

26

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

    a. Within 30 days prior to the anticipated harvest of a designated hemp lot, an approved sampling agent, State or Tribally designated person or Federal, State, local, or Tribal law enforcement agency shall collect representative samples from such cannabis plants for THC concentration level testing.

4. Field Sampling:

    a. The licensee or designated employee should accompany the sampling agent throughout the sampling process, if possible.

5. Surveillance of the growing area.

    a. The sampling agent should verify the GPS coordinates of the growing area as compared with the GPS coordinates submitted by the licensee to USDA.

    b. The sampling agent should estimate the average height, appearance, approximate density, condition of the plants, and degree of maturity of the inflorescences (flowers/buds).

    c. The sampling agent should visually establish the homogeneity of the stand to establish that the growing area is of like variety.

6. Time of Sampling:

    a. Within 30 days prior to the anticipated harvest of a lot a sampling agent should collect representative samples from such a lot for THC concentration level testing.

7. Field Sampling:

    a. For purposes of determining the number of individual plants to select for sampling, the size of the growing area should be considered. For sampling purposes, samples from separate lots must be kept separate and not be comingled.

    b. For lots of less than one acre, including greenhouses, select a minimum of 1 plant, then take a cutting from the plant to form a sample. For lots of 1 to 10 acres, including greenhouses, follow the chart in example 2 below, take cuttings of each plant, then combine to form a composite sample.

    c. For growing areas larger than ten (10) acres, including greenhouses, the number of plants that should be selected to form a composite sample is based upon the Codex Alimentarius Recommended Methods of Sampling for the Determination of Pesticide Residues for Compliance with MRLS CAC/GL 33-1999.

    d. The sample size is estimated in a two-step process. The first step is to estimate the number of primary plants to be sampled. The second step is to adjust the estimate of primary plants by the acreage under cultivation.

27

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

The initial number of primary plants is estimated using:

$$n_o = \frac{\ln(1-p)}{\ln(1-i)}$$

where $p$ is the confidence level to detect hemp plants testing above the acceptable THC threshold and $i$ is the proportion of hemp plants having THC content above the acceptable threshold. The values for $i$ are based on past experience in the same or similar growing areas, and should be consistent with the requirements currently in the Final Rule.

The initial primary plants estimate is adjusted by the number of acres to calculate the minimum number of primary plants as follows:

$$n = \frac{n_o}{1 + \frac{(n_o - 1)}{N}}$$

where $n$ is the minimum number of primary plants to be selected for forming a composite sample, $n_o$ is the initial number of primary plants estimated using the previous formula, and $N$ is the number of acres under cultivation.

Examples 1 and 2 below describe the minimum number of samples that must be collected in order to meet the 95% confidence level requirements in the Final Rule. If a State or Tribal hemp program does not have data from a prior growing season to determine the $i$ value, the sampling charts below may be utilized. State and Tribal hemp programs are free to include more rigorous sampling requirements, or to develop performance based requirements.

28

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Example 1: The initial primary plant sample size is 299 with a confidence level of 95% to detect hemp plants having an acceptable hemp THC level and a proportion of hemp plants having THC content above the acceptable threshold equal to 0.01 is considered appropriate. The adjusted primary plant sample sizes for fields from 11 to 173 acres in size are shown in the following table:

| Number of acres | Sample Size | Number of acres | Sample Size | Number of acres | Sample Size | Number of acres | Sample Size |
|---|---|---|---|---|---|---|---|
| 11 | 11 | 40 | 36 | 75-76 | 61 | 119-120 | 86 |
| 12 | 12 | 41-42 | 37 | 77 | 62 | 121-122 | 87 |
| 13 | 13 | 43 | 38 | 78-79 | 63 | 123-124 | 88 |
| 14 | 14 | 44 | 39 | 80-81 | 64 | 125-126 | 89 |
| 15 | 15 | 45-46 | 40 | 82 | 65 | 127-128 | 90 |
| 16 | 16 | 47 | 41 | 83-84 | 66 | 129-130 | 91 |
| 17 | 17 | 48 | 42 | 85-86 | 67 | 131-132 | 92 |
| 18-19 | 18 | 49-50 | 43 | 87 | 68 | 133-134 | 93 |
| 20 | 19 | 51 | 44 | 88-89 | 69 | 135-136 | 94 |
| 21 | 20 | 52 | 45 | 90-91 | 70 | 137-138 | 95 |
| 22 | 21 | 53-54 | 46 | 92 | 71 | 139-140 | 96 |
| 23 | 22 | 55 | 47 | 93-94 | 72 | 141-143 | 97 |
| 24 | 23 | 56 | 48 | 95-96 | 73 | 144-145 | 98 |
| 25-26 | 24 | 57-58 | 49 | 97-98 | 74 | 146-147 | 99 |
| 27 | 25 | 59 | 50 | 99 | 75 | 148-149 | 100 |
| 28 | 26 | 60-61 | 51 | 100-101 | 76 | 150-152 | 101 |
| 29 | 27 | 62 | 52 | 102-103 | 77 | 153-154 | 102 |
| 30 | 28 | 63-64 | 53 | 104-105 | 78 | 155-156 | 103 |
| 31-32 | 29 | 65 | 54 | 106-107 | 79 | 157-157 | 104 |
| 33 | 30 | 66-67 | 55 | 108 | 80 | 159-161 | 105 |
| 34 | 31 | 68 | 56 | 109-110 | 81 | 162-163 | 106 |
| 35 | 32 | 69-70 | 57 | 111-112 | 82 | 164-166 | 107 |
| 36 | 33 | 71 | 58 | 113-114 | 83 | 167-168 | 108 |
| 37-38 | 34 | 72-73 | 59 | 115-116 | 84 | 169-170 | 109 |
| 39 | 35 | 74 | 60 | 117-118 | 85 | 171-173 | 110 |

29

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Example 2: The adjusted primary plant sample sizes for fields from less than 1 to 10 acres in size are shown in the following table:

| Number of acres | Sample Size |
|---|---|
| Less than 1 | 1 |
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |

e. Sampling agents should always walk at right angles to the rows of plants if possible, beginning at one point of the lot and walking towards another point on the opposite side of the lot. If the lot is too dense for this to be possible, the sampling agent should take all reasonable steps to ensure that a sample is collected that represents a homogeneous composition of the lot by avoiding edges and thoroughfares.

f. While walking through the growing area, the sampling agent should cut at least "n" inflorescences (the flower or bud of a plant) based on the acreage of the growing area , at random but convenient distances. Avoid collecting sample specimens from the borders of the field/greenhouse.

g. The cut should be obtained from the flowering tops of plants when flowering tops are present, and shall be approximately five to eight inches in length from the "main stem" (that includes the leaves and flowers), "terminal bud" (that occurs at the end of a stem), or "central cola" (cut stem that  develops into a bud) of the flowering top of the plant.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356



h.  Utilize paper sample bag(s) for collecting sample cuttings. Ensure that each bag has the minimum number of cuttings, n, as calculated by 7.4, or in the Example Tables 1 and 2. If one bag cannot accommodate the minimum number of cuttings due to lot size, the sample may be divided into multiple bags, but must be clearly labeled in such a way that each bag is appropriately matched with the corresponding lot. (i.e. For lot 101 with three corresponding sample bags: 101 1 of 3, 101 2 of 3, 101 3 of 3.)

i.  Seal each bag and record the sample number or other documentation as required by the State or Tribe.

j.  A sampling protocol must have the potential to ensure, at a confidence level of 95 percent, that the cannabis plants will not test above the acceptable hemp THC level of 0.3 percent on a dry weight basis.

8.  Sample identification:

a.  The sampling agent should seal each bag and record the sample identification number. The sample should also be identified with the following information: Sampling agent contact information; name and contact information of the producer; producer hemp license or authorization number; date of sample; and lot, subfield, or other identifier as provided by the USDA Farm Service Agency; any other information that may be required by States, Tribes, Law Enforcement Authorities, mail delivery services, Customers or groups of customers.

Note: In accordance with 7 CFR 1.901(e), the contents of this document does not have the force and effect of law and are not meant to bind the public in any way, and the document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

**APPENDIX 2**

**Remediation and Disposal Guidelines for Hemp Growing Facilities**

**U.S. Domestic Hemp Production Program Issued January 15, 2021**

**PURPOSE:**

1. Standard Remediation and Disposal guidelines are specified for commercial indoor and outdoor production of hemp as well as the production of hemp for research purposes.

2. Remediation refers to any process by which non-compliant hemp (THC concentration > 0.3%) is rendered compliant (THC concentration ≤ 0.3%). Remediation can be achieved by separating and destroying non-compliant flowers while retaining stalks, leaves, and seeds; or by shredding the entire hemp plant to create a homogenous "biomass" that can be retested for THC compliance.

3. Disposal means destroying non-compliant hemp or hemp for research purposes using one of the approved on-farm methods. Approved methods include plowing under, mulching / composting, disking, bush mowing, deep burial, and burning.

**SCOPE:**

1. Commercial lots shall be subject to remediation or disposal when a sample tests over the acceptable hemp THC level according to laboratory results obtained through, USDA approved State or Tribal sampling and testing protocols or USDA sampling and testing protocols.

2. Commercial lots that test above the acceptable hemp THC level shall be subject to either remediation or disposal.

3. Samples must be collected by a USDA-approved sampling agent, an approved state agency, or by a Federal, State, or Tribal law enforcement agent authorized by USDA to collect samples.

4. It is the responsibility of the licensed producer or researcher to pay any fees associated with resampling, remediation, and/or disposal.

5. Producers must verify disposal or remediation by submitting required documentation in accordance with 7 CFR §990.27. All records regarding disposal and remediation of all cannabis plants that do not meet the definition of hemp shall be made available for inspection by State, Tribal, or USDA inspectors, auditors, or their representatives during reasonable business hours in accordance with an applicable State or Tribal plan or §990.28.

6. Laboratories should have an effective disposal procedure as part of an internal SOP for non-compliant samples.

**SUMMARY OF PRACTICE:**

1. This practice provides procedures for ensuring the disposal or remediation of non-compliant hemp. When a cannabis sample tests over the acceptable THC concentration level, all cannabis

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

plants in the lot shall either be remediated to bring the lot under the acceptable THC concentration level, or all cannabis plants shall be disposed of. Both remediation and disposal may be performed by the producer, researcher or an approved representative of the State, Tribe, or USDA.

In accordance with §990.3, the State or Tribal plan shall include methodologies for ensuring that non-compliant hemp is properly remediated or destroyed. This may come in the form of in-person verification by State or Tribal representatives, or alternative requirements that direct growers to provide pictures, videos, or other proof that disposal or remediation occurred successfully. Hemp produced for research must be disposed of in accordance with the applicable State or Tribal plan or §990.21(d), for research conducted with a USDA producer license.

2. Non-compliant hemp plants may be remediated by separating and destroying non-compliant flowers, while retaining stalks, leaves, and seeds.

3. Non-compliant hemp plants may be remediated by shredding the entire hemp plant to create "biomass." All flowers, buds, trichomes, leaves, stalks, seed, and all plant parts from a lot should be chopped or shredded in such a way as to create a homogenous, uniform blend of the lot called "biomass." Lots should be kept separate and not be combined during this process. This biomass shall be resampled and retested to ensure the biomass material tests within an acceptable THC concentration level before it may enter the stream of commerce in accordance with §990.3(d) and §990.27(c). If the biomass tests above the acceptable THC concentration level is non-compliant hemp and must be destroyed through one of the disposal options provided herein.

4. Disposal means destroying non-compliant hemp by performing any one or combination of the following on-farm activities: plowing under, mulching / composting, disking, bush mowing, deep burial, and burning.

**EQUIPMENT AND SUPPLIES:**

1. Equipment for Remediation

    a. Gloves

    b. Shears, clippers, scissors, shredding equipment (to remove non-compliant flowers from stalks)

    c. Striping, shredding, or mulching equipment

    d. Large plastic bags or other containers to store shredded biomass

    e. The bags and containers should be made from material known to be free from THC

    f. Marking and labeling equipment (to mark and label hemp lots for remediation from other lots)

2. Equipment for Disposal

    a. Plow or tractor (for plowing, mulching, composting, disking, bush mowing, deep burial)

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

    b.   Composter (for composting)

    c.   A burn area and fire equipment (for burning non-compliant lots)

3.   Equipment for Resampling

    a.   Disposable gloves – Nitrile

    b.   Scoop with long handle (cleaned prior to and following each sample)

    c.   Bag to store resample

    d.   Permanent markers

    e.   The bags should be made from material known to be free from THC

    f.   A 750 mL or similar measuring instrument (cleaned prior to and following each sample)

## REMEDIATION GUIDELINES:

1.   The licensee or designated employee; or an approved representative of the State, Tribe, or USDA shall remediate or destroy non-compliant hemp in accordance with §990.3(d) and §990.27(c). As part of a State or Tribal plan, a State or Tribe shall create procedures for ensuring that any non-compliant hemp parts or biomass that are non-compliant with the acceptable hemp THC level after remediation are properly destroyed and unable to enter the stream of commerce as set forth in 7 C.F.R. § 990.3(a)(6). A State or Tribal plan may require that State or Tribal officials be present during the remediation or disposal process.

2.   Upon notification that a lot has tested above the acceptable hemp THC level, the licensee should notify the appropriate licensing authority of the licensee's decision to either destroy or remediate the non-compliant lot in accordance with the State, Tribal, or USDA plan. The licensee shall notify the State, Tribe, or USDA of their decision to either remediate or dispose of the non-compliant lot. Additionally, the licensee should notify the State, Tribe, or USDA, of the remediation or disposal method set forth in §990.70 and §990.71.

3.   If the licensee chooses to remediate the non-compliant lot, the licensee should select either to separate and remove all flowers from stalks, leaves and seeds of the lot or to shred the entire lot into "biomass."

4.   Separation and removal of the flowers from stalks, leaves and seeds:



    a.   The flowers, including buds, trichomes, "trim," and "kief," should be removed from the lot and destroyed. As part of a State or Tribal plan, State and Tribes should include

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

acceptable methods for the removal of non-compliant flowers and floral material under this remediation strategy. Methods may include, but are not limited to, the removal, by hand, of non-compliant flowers and floral materials and the mechanical removal of non-compliant flowers and floral materials.

b.  Until such time as the non-compliant flowers and floral material are disposed of, the stalks, leaves, and seeds should be separated from the non-compliant floral material and clearly labeled and demarcated as "hemp for remediation purposes."

c.  Seeds removed from non-compliant hemp during remediation should not be used for propagative purposes.

5.  Creation of Biomass



a.  The entire lot, as reported to the FSA, should be shredded to create a homogenous, uniform biomass. As part of a State or Tribal plan, State and Tribes shall include acceptable methods for the creation of biomass under this remediation strategy. Methods may include, but are not limited to, the shredding of hemp plants through shredders, composters, or specialty mechanical equipment.

b.  The biomass created through this process shall be resampled and retested to ensure compliance before entering the stream of commerce in accordance with §990.3(a)(6) and §990.27(c). Biomass that fails the retesting is non-compliant hemp and shall be destroyed.

c.  Remediated biomass should be separated from any compliant hemp stored in the area and clearly labeled and demarcated as "hemp for remediation purposes." All lots subject to remediation should be stored, labeled and demarcated apart from each other and from other compliant hemp lots stored or held nearby.

d.  Remediated biomass should not leave the labeled and demarcated area until a test result showing compliance with the acceptable hemp THC level is received or until the biomass will be destroyed.

**RE-SAMPLING REMEDIATED BIOMASS:**

1.  Remediated biomass shall be resampled and retested to ensure compliance before entering the stream of commerce in accordance with §990.3(a)(6) and §990.27(c). Biomass that fails the retesting shall be destroyed.

2.  The resample should be taken by sampling agent as described in the "Sampling Guidelines."

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

3. A representative sample of the biomass should be taken for compliance purposes. When taking the resample, the sampling agent should take biomass material from various depths, locations, and containers in the labeled and demarcated area to collect a representative sample of the material. At minimum, ~750 mL or three (3) standard measuring cups of biomass material should be collected. Sampling agents may collect more biomass material based on the requirements of the testing laboratory. If ~750 mL of material is not available, the sampling agent should collect enough biomass material for a representative sample.

4. An original copy of the resample test results, or a legible copy, should be retained by the producer or an authorized representative and available for inspection for a period of three (3) years from the date of receipt.

5. Laboratories testing a resample should utilize the same testing protocols as when testing a standard sample as described in the "Laboratory Testing Guidelines."

**DISPOSAL GUIDELINES:**

| Photo Example | Ag Production Activity | Compliant Outcome | Photo Example |
|---|---|---|---|
|  | **Plowing Under**<br><br>Curved plow bladesrotate subsoil to surface andbury crop below | **Plowing Under**<br><br>"Green Manure"<br><br>Amends soil directlyfrom crop |  |
|  | **Mulching / Composting**<br><br>Fields cropcut and blended with manure or other biomass material | **Mulching / Composting**<br><br>"Green Manure"<br><br>Mulch mixed with manure or other biomass |  |
|  | **Disking**<br><br>Leveling offield using tow-behind disk implement | **Disking**<br><br>"Green Manure"<br><br>Amends soil directlyfrom crop while leveling field |  |

| Photo Example | Ag Production Activity | Compliant Outcome | Photo Example |
|---|---|---|---|
|  | **Bush Mower/Chopper** Commercial lawn mower used to shred and mix thick vegetation | **Bus Mower/Chopper** "Green Manure" Shredded biomass decomposes into soil |  |
|  | **Deep Burial** Fields are trenched, surface soil is buried at depth of at least 12" | **Deep Burial** Field biomass buried in trenches and covered with soil |  |
|  | **Burning** Setting fire to specific production fields or biomatter piled on the field | **Burning** Fields are cleared of all plant material |  |

Note: In accordance with 7 CFR 1.901(e), the contents of this document does not have the force and effect of law and are not meant to bind the public in any way, and the document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356



A‌LAN W‌ILSON
A‌TTORNEY G‌ENERAL

July 10, 2019

Mr. Mark A. Keel, Chief
South Carolina Law Enforcement Division
P.O. Box 21398
Columbia, SC 29221-1398

Dear Chief Keel:

You have requested our opinion "on several aspects of the Hemp Farming Act (Act 14 of 2019, formerly H. 3449) which was signed into law by Governor McMaster on March 28, 2019." Your letter provides the additional background, and we quote therefrom as follows:

> . . . It appears that this bill makes the possession and storage of unprocessed or raw hemp plant material by certain individuals in South Carolina without a license unlawful. Specifically, S.C. Code Ann. § 46-55-20(A)(l) states that it is "unlawful for a person to cultivate, handle, or process hemp in this State without a hemp license" issued by the South Carolina Department of Agriculture.

> Hemp is defined in this article as "the plant Cannabis sativa L. and any part of that plant, including the nonsterilized seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with the federally defined THC level for hemp" which is "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis" using post-decarboxylation or similarly reliable methods. See S.C. Code Ann. § 46-55-10(6), (8). Hemp products is also a defined term in this bill; however, this definition specifically excludes raw plant material indicating unequivocally that "[u]nprocessed or raw plant material, including nonsterilized hemp seeds, is not considered a hemp product." S.C. Code Ann. § 46-55-10(9).

> SLED is informed and believes that only individuals and businesses who are licensed by the Department of Agriculture can legally "cultivate, handle, or process hemp" in South Carolina in accordance with this article without violating South Carolina law. "Handling" is defined in this statute as "possessing or storing hemp for any period of time." It also "includes possessing or storing hemp in a vehicle for any period of time other than during its actual transportation from the premises of a licensed person to cultivate or process industrial hemp to the premises of another licensed person". See S.C. Code Ann. § 46-55-10(7). "Processing" means "converting an agricultural commodity into marketable form". See S.C. Code Ann. § 46-55-10(12).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 2
July 10, 2019

Of course, it would appear to SLED that should any raw plant material being sold as hemp contain more than a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis using post-decarboxylation or similarly reliable methods, the material would be marijuana and thus punishable by all currently existing South Carolina state and federal laws prohibiting possession, distribution, possession with intent to distribute, and trafficking marijuana.

Accordingly, SLED would specifically seek guidance on the following questions:

1.  Is the retail sale of unprocessed or raw hemp plant material a criminal violation in the State of South Carolina? If so, what are the potential penalties for such?

2.  Is the possession of unprocessed or raw hemp plant material by an unlicensed store patron or subsequent purchaser a criminal violation in the State of South Carolina? If so, what are the potential penalties for such?

3.  Is unprocessed or raw hemp plant material contraband per se and subject to seizure when possessed, cultivated, handled, or processed in this State by a person without a hemp license issued by the South Carolina Department of Agriculture?

4.  Does merely placing raw plant material in a package constitute processing hemp into a hemp product?

5.  What are the potential penalties associated with retail sale or possession of a substance that contains more than a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis using post-decarboxylation or similarly reliable methods?

## Law/Analysis

Your letter provides a correct summary of the law. The Hemp Farming Act has as its centerpiece the prohibition of possessing and handling hemp, as defined, without the necessary license, while at the same time, providing that the law does not apply to hemp products and extracts, including those containing cannabinoids, including CBD. One court recently explained the close similarity of hemp and marijuana to each other. In Lundy v. Commonwealth, 511 S.W.3d 398, 404 (Ky. 2017), the Kentucky Court of Appeals stated:

Hemp and marijuana are visually indistinguishable and derive from different portions of the same plant, Cannabis sativa. "[T]he drug is derived from the flowers or leaves of the plant while the fibers used for rope and other industrial products are taken from the stalk." New Hampshire Hemp Council, Inc. v. Marshall, 203 F.3d 1, 3 (1st Cir. 2000). Although hemp and marijuana contain tetrahydrocannabinol (THC), plants grown to produce marijuana contain a much higher level of THC than those grown for industrial products. Thus, while marijuana has historically been used for its psychoactive effect, hemp has been used in industrial products since as early as the

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 3
July 10, 2019

> 1600s. See Christine A. Kolosov, <u>Evaluating the Public Interest: Regulation of Industrial Hemp Under the Controlled Substances Act</u>, 57 UCLA L. Rev. 237, 238 (2009). Hemp was so commonly used to make paper products and rope that "[t]he first drafts of the United States Constitution and the Declaration of Independence were both penned on hemp paper[.]" Id.

> Despite its industrial uses and value as an agricultural crop, hemp was ultimately criminalized under federal and state law. The origins of its criminalization under federal law is found in the "Marihuana Tax Act of 1937," which "was to treat industrial-use and drug-use marijuana differently by taxing them at different rates, or not at all." <u>United States v. White Plume</u>, 447 F.3d 1067, 1071 (8th Cir. 2006). When the Controlled Substances Act was enacted by Congress in 1970, the Tax Act was repealed in favor of criminalizing the growing of marijuana. <u>Id</u>. at 1072. However, the Tax Act's definition of marijuana was adopted verbatim criminalizing "the growing of marijuana whether it was intended for industrial-use or drug-use." <u>Id</u>. That same definition is contained in the current version of the Controlled Substances Act.

> Under the Controlled Substances Act, marijuana is defined as follows:

>> The term [marijuana] means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

> 21 U.S.C. § 802 (16).

Along the same lines, as the Court recognized in <u>Lundy</u>, in <u>Op. S.C. Att'y Gen.</u>, 2014 WL 7505274 (June 6, 2014), we addressed the status of industrial hemp in South Carolina in an opinion rendered prior to the passage of the federal Farm Act of 2018, which we discuss below. In that 2014 opinion, we advised as to whether Act 216 (signed into law on June 2, 2014), which provides for industrial hemp cultivation in this State, was preempted by federal law. We concluded that it was. Our opinion explained:

> . . .[w]e believe a court interpreting the validity of Act 216 would likely find state regulation of industrial hemp is largely preempted by federal law under the CSA, with the exception of the narrow circumstances permitted under Section 7606. Specifically, because Section 7606 does not authorize private individuals, their authorized entities, or organizations to cultivate industrial hemp, we believe a Court would likely find that despite the terms of Act 216, the Department cannot legally authorize private individuals or organizations to do so. The same is true with respect

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 4
July 10, 2019

> to permits as, "[f]ederal section 7606 limits those who may grow or cultivate industrial hemp to two kinds of entities: institutions of higher education, and state departments of agriculture." Op. Cal. Att'v Gen., 2014 WL 2573229 (June 6, 2014). As a result, unless the entities seeking permits meet Section 7606(a)'s definition of an "institute of higher education," or in the alternative, meet Section 7606(b)(3)'s definition of a "state department of agriculture," federal law continues to prohibit the cultivation of industrial hemp despite terms of Act 216.

However, enactment of the 2018 Farm Act by Congress dramatically revised the treatment of industrial hemp throughout the United States, including South Carolina.  As described by the National Conference of State Legislatures,

> [t]he 2018 Farm Bill changed federal policy regarding industry hemp, including the removal of hemp from the Controlled Substances Act and the consideration of hemp as an agricultural product. The bill legalized hemp under certain restrictions and expanded the definition of industrial hemp from the last 2014 Farm Bill. The bill also allows states and tribes to submit a plan and apply for primary regulatory authority over the production of hemp in their state or in their tribal territory. A state plan must include certain requirements, such as keeping track of land, testing methods,  and disposal of plants or products that exceed the allowed THC concentration.

> Previously, the 2014 Farm Bill defined industrial hemp and allowed for state departments of agriculture or universities to grow and produce hemp as part of research or pilot programs. Specifically, the law allowed universities and state departments of agriculture to grow or cultivate industrial hemp if:

> "(1) the industrial hemp is grown or cultivated for purposes of research conducted under an agricultural pilot program or other agricultural or academic research; and

> (2) the growing or cultivating of industrial hemp is allowed under the laws of the state in which such institution of higher education or state department of agriculture is located and such research occurs."

> The U.S. Department of Agriculture, in consultation with the U.S. Drug Enforcement Agency (DEA) and the U.S. Food and Drug Administration, released a Statement of Principles on Industrial Hemp in the Federal Register on Aug 12, 2016,  on the applicable activities related to hemp in the 2014 Farm Bill.

http:/www/ncsl.org/research/agriculture-and-rural-development/state-industrial-hemp-statutes.aspx.

The passage of the 2018 Farm Act by Congress immediately led to enactment of South Carolina Act 14 of 2019, which you well outline in your letter and which addresses the status of industrial hemp in this State.  The purpose of the Hemp Farming Act is succinctly summarized by the legislation's title: "An Act . . . Relating To Industrial Hemp Cultivation, . . . To Define Necessary Terms, [And] To Prohibit The Cultivation, Handling, or Processing of Hemp Without

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 5
July 10, 2019

A Hemp License Issued By The South Carolina Department of Agriculture. . . ." Thus, the centerpiece of the legislation is § 46-55-20(A)(1) which provides that "It is unlawful for a person to cultivate, handle, or process hemp in this State without a hemp license issued by the Department pursuant to the state plan." (emphasis added). Without a license, as explained below, the handling (including possession) or processing of hemp, as defined by the Act, is characterized as "unlawful." Your letter seeks clarity as to exactly what this means for law enforcement.

As you note in your letter, the term "hemp" or "industrial hemp" as defined by the Act, "means the plant Cannabis Sativa L, and any part of that plant, including the nonsterilized seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts by isomers whether growing or not, with the federally defined THC level for hemp." See § 46-55-10(8). Hemp or "industrial hemp" is "deemed an agricultural commodity." On the other hand, however, anything exceeding the 0.3% concentration of THC, as defined, transforms industrial hemp into a controlled substance (marijuana) under federal and state law. In this regard, the Act defines the "federally defined THC level for hemp" as "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis, or the THC concentration for hemp defined in 7 U.S.C. Section 5940, whichever is greater." As one court has recently stated, "[b]y choosing to define industrial hemp based upon the concentration of THC in the plant Cannabis Sativa L, Congress did not amend the CSA so much as carve out a clear exception for industrial hemp . . . [and] Congress clearly 'swept away' the provision of the CSA, at least in so much as it restricts the growth, cultivation, and marketing of industrial hemp." U.S. v. Mallory, 372 F.Supp.3d 377, 386 (S.D.W.Va. 2019).

The Act also defines "hemp products." Hemp products are defined as follows:

> All products with the federally defined THC level for hemp derived from, or made by processing hemp plants or hemp plant parts, that are prepared in a form available for commercial sale, including, but not limited to, cosmetics, personal care products, food intended for animal or human consumption, cloth, cordage, fiber, fuel paint, paper, particleboard, plastics, and any product containing one or more hemp-derived cannabinoids, such as cannabinoil. Unprocessed or raw plant material, including nonsterilized hemp seeds is not considered a hemp product.

Section 46-55-30 makes clear, moreover, that the Act does not seek to regulate hemp products as defined: "The provisions contained in this chapter do not apply to the possession, handling, transport or sale of hemp products and extracts, including those containing hemp-derived cannabinoids, including CBD. Nothing in this chapter authorizes an person to violate any federal or state law or regulation." (emphasis added).

With that background in mind, we will now turn to your specific question. In addressing your specific questions, several principles of statutory construction are applicable. First and foremost, in interpreting an act, the primary objective is to ascertain and effectuate the intent of the legislature. Bankers Trust of South Carolina v. Bruce, 275 S.C. 35, 37, 267 S.E.2d 424, 425

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 6
July 10, 2019

(1980). Words used in statutes should be given their plain and ordinary meanings, and applied literally in the absence of ambiguity. McCollum v. Snipes, 213 S.C. 254, 266, 49 S.E,2d 12, 16 (1948). "What a legislature says in the text of a statute is considered the best evidence of the legislative or will" and "courts are bound to give effect to the expressed intent of the legislature." Hodges v. Rainey, 341 S.C. 79, 85, 553 S.E.2d 578,581(2000).

In addition, our courts have recognized that there are occasions where legislative intent must prevail over the literal language used in the statute. It is well settled that "[c]ourts are not always confined to the literal meaning of a statute. . . ." S.C. Dept. of Social Services v. Forrester, 282 S.C. 512, 516, 320 S.E.2d 39, 42 (Ct. App. 1984). Indeed, our Supreme Court recognized in Wade v. State of South Carolina, 348 S.C. 255, 259, 559 S.E.2d 843, 845 (2002), the following rule of construction:

> [a]dditionally, courts are not confined to the literal meaning of a statute where the literal import of words contradicts the real purpose and intent of the lawmakers. Greenville Baseball v. Bearden, 200 S.C. 363, 20 S.E.2d 813 (1942). To obtain the real purpose and intent of the lawmakers a court must not look to the "phraseology of an isolated section or provision, but the language of the statute as a whole considered in the light of its manifest purpose." City of Columbia v. Niagara Fire Ins. Co., 249 S.C. 388, 391, 154 S.E.2d 674, 676 (1967). All provisions of a statute must be given full force and effect. Nucor Steel v. South Carolina Pub. Serv, Com'n, 310 S.C. 539, 426 S.E.2d 319 (1992).

As was said in Hamm v. S.C. Public Service Comm'n., 287 S.C. 180, 182, 336 S.E.2d 470,471 (1985), "[h]owever clear the language of a statute may be, the court will reject that meaning when it leads to an absurd result not possibly intended by the legislature." Further, "'it is a rule of construction well known that, in undertaking to fix and place meaning upon statutes, we should do so in light of the contemporaneous history, and in reference to the habits and activities of our people. '" Palmetto Golf Club v. Robinson, 143 S.C. 347, 141 S.E. 610, 621 (1928), (quoting Ex Parte Roquemore, 60 Tx. Crim.R. 282, 131 S.W. 1101, 1103 (1935)). Moreover, the touchstone of interpretation is that "[a] statute as a whole must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers." Browning v. Hartvigsen,307 S.C. 122,125,414 S.E.2d 115,117 (1992). Finally, "[p]enal statutes are strictly construed against the State and in favor of the defendant." State v. Morgan, 352 S.C. 359, 365, 574 S.E.2d 203, 206 (Ct. App. 2002). As was said by our Supreme Court in S.C. Dept. of Revenue v. Collins Entertainment Corp., 340 S.C. 77, 78, 530 S.E.2d 635, 636 (2000),

> "[t]he principle is well established that penal statutes are strictly construed, and one who seeks to recover a penalty for the failure on the part of the defendant to discharge some duty imposed by law, must bring this case clearly within the language and meaning of the statute awarding the penalty. Such laws are to be expounded strictly against the offender and liberally in his favor. . . . And it is immaterial for the purpose of the application of the rule of strict construction whether the proceedings for the enforcement of the penal law, be criminal or civil. . . ." (quoting State ex rel. Moody v. Stern, 213 S.C. 465, 50 S.E.2d 175 (1948)).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 7
July 10, 2019

To once again summarize the Act, § 46-55-20(A)(1) makes it "unlawful for a person to cultivate, handle or process hemp in this State without a hemp license. . . ." "Handling" of hemp or industrial hemp "means possessing for any period of time" and includes storing hemp "in a vehicle for any period of time other than during actual transport from the premises of a licensed person to cultivate or process industrial hemp to the premises of another licensed person." § 46-55-10(7). "Handling" under the Act "does not mean possessing or storing finished hemp products." Although the Act is inapplicable to "hemp products," as defined by § 46-55-10(9), and expressly excludes possession or storage of finished hemp products, the Act also makes clear that "unprocessed or raw plant material, including nonsterilized plant seeds is not considered a hemp product." Thus, the Act makes a distinction between "industrial hemp," as defined and "hemp products" makes clear that "unprocessed, raw plant material, including nonsterilized plant seeds" is not a "hemp product."

Accordingly, with respect to your first two questions, only with a license issued by the Department of Agriculture, "may a person cultivate, handle, or process hemp" in South Carolina. The Act defines "hemp" as well as "hemp products." Without such a license, unprocessed or raw plant material, including nonsterilized hemp seeds, may not be processed, cultivated or sold, or even possessed without the necessary license. One case, Lundy v. Commonwealth, supra provides instructive guidance in this regard. There, the defendant was charged with possession of marijuana. He did not have a hemp license, as required by Kentucky law, for the cultivation or possession of industrial hemp. He argued, however, that the industrial hemp he was charged with possessing was within the THC limit, and thus was legal. However, the Court stated:

> [w]hile the level of THC distinguished marijuana plants from hemp plants under federal law and Kentucky law, that distinction is only relevant if Mark could legally possess industrial hemp. Under Kentucky law, he could do so only if properly licensed and engaged in growing hemp or possessing hemp for industrial use. No such evidence was presented. If the facts were different and Mark could legally possess industrial hemp or was in possession of a commercial hemp product containing THC, we would agree that the Commonwealth must establish the THC level in the plant or the product was more than .3 percent. That simply is not the case.

511 S.W.3d at 406-07 (emphasis added).

Having concluded that such activity is "unlawful" under the Act, the next question is whether that activity is criminal and, if so, what are the penalties for a violation? In other words, the issue becomes whether the General Assembly's use of the term "unlawful" is synonymous with "criminal?" In its ordinary connotation, the word "unlawful" simply means "an act prohibited by the law." Lion Oil Co. v. Marsh, 249 S.W.2d 569, 572 (Ark. 1952). As we stated in Op. S.C. Att'y Gen., 1971 WL 17598 (Op. No. 3225) (December 13, 1971), "[t]he term 'unlawful' as you are well aware, is not synonymous with the term 'criminal.' 43 WORDS AND PHRASES, Unlawful at 548. The term 'unlawful' means without authority of law. Pinder v. State, 27 Fla. 370, 8 So. 837."

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP140O356

Mr. Mark A. Keel, Chief
Page 8
July 10, 2019

On the other hand, in State v. Cofield, 22 S.C. 301 (1885), our Supreme Court addressed the question of the meaning of Section 1731, General Statutes, which provided that

> [n]o license for the sale of spirituous or intoxicating liquors shall be granted in South Carolina outside of the incorporated cities, towns, and villages of this state, and it shall be unlawful for any person or persons to sell, such liquors without a license.

(emphasis added). It was argued by the appellant, who was convicted under such provision, that "the sale without a license within the limits or incorporate towns and cities" was not a criminal offense. Noting that the statute should be "strictly construed," the Court still held that there was no doubt that the part of the statute declaring it to be "unlawful" to sell liquor without a license was clear on its face and involved a criminal law:

> [n]ow the difficulty here, though it is a criminal act under consideration, does not arise from any doubtful signification of the words of the act; they are plain and simple and do not require any liberal or enlarged interpretation to ascertain their meaning. "It shall be unlawful to sell spirituous liquors without a license." Nothing could be plainer than this, each word used for a well defined meaning, and he "that runs may read," etc. But the matter in doubt is the territorial limit within which the unlawful sale is prohibited. How far does it extend?

Id. at 303. With respect to the issue of the territorial requirements of the statute, the Cofield Court further concluded:

> [b]ut Sections 1732 and 1733, providing a mode of obtaining licenses in incorporate towns and villages, and thereby legalizing sales made therein with license, there was great propriety in using the words "without a license" in the portion of the act which pointed to the sale as unlawful and criminal whether inside or outside of the terms, the illegality being the fact of no license and not the place where the sale took place. So that construing the whole act together, not with reference to the offence denounced, for that is plain enough, i.e., "selling without a license," but the territory within which it was to be of force, we must conclude that it was to have general application.

Id. at 304.

The context in which Act 14 of 2019 was enacted is also instructive for purposes of determining its meaning. As noted above, Lundy, supra, stated that "[d]espite its industrial uses and value as an agricultural crop, hemp was ultimately criminalized under federal and state law." Further, the cultivation of industrial hemp is now deemed as an exception to the Controlled Substance Act. U.S. v. Mallory, supra. In short, it may be argued that, in the context of Act 14's passage, since the handling and cultivation of hemp was criminal conduct prior to the Act, in now requiring licensure, all unlicensed activity concerning hemp, as defined, remains criminal. Thus, when the term "unlawful" was used in Act 14, even though the word "unlawful" is not

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 9
July 10, 2019

necessarily synonymous with "criminal," it is reasonable to conclude that in this instance such usage meant "criminal" as far as the General Assembly was concerned.  In other words, a court may well deem the legislative intent here sufficient to override the ordinary meaning of the word "unlawful" and conclude that possession of hemp, as defined, without the necessary license constitutes a criminal offense.

With respect to the question of punishment – even if this "unlawful" conduct is deemed by a court to be criminal – we note that § 17-25-30 of the Code provides for sentencing when no punishment is provided by statute.  Such provision states:

> [i]n cases of legal conviction when no punishment is provided by statute the court shall award such sentence as conformable to the common usage and practice in this State, according to the nature of the offense, and not repugnant to the Constitution.

The Supreme Court has held that "because no sentence is specified for [a particular crime, i.e. aggravated breach of the peace in that instance], . . . Section 17-25-30 of the South Carolina Code controls." State v. Simms, 412 S.C. 590, 598, 774 S.E.2d 445, 449 (2015).  So long as a particular sentence is within the limits of § 17-25-30, according to the Court in Simms (up to ten years), it is valid.  For the offense of aggravated breach of the peace, present in Sims, the trial court had sentenced the defendant, pursuant to § 17-25-30, to ten years imprisonment, suspended upon the service of three years.  Such a sentence was well within the limits of § 17-25-30, concluded the Court.  Therefore, should a court conclude that "unlawful" conduct, pursuant to the Act, equates with criminal conduct, the court could apply § 17-25-30.

You next ask whether "unprocessed or raw hemp plant material [is] contraband per se and subject to seizure when possessed, cultivated, handled, or processed in this State by a person without a hemp license issued by the South Carolina Department of Agriculture?"  It is our opinion that, a court likely would, depending upon the facts, conclude that without the necessary license, possession, cultivation, handling or processing of raw hemp plant material is contraband per se, and subject to seizure.

We first examine the meaning of the term contraband per se.  In Mims Amusement Co. v. SLED, 366 S.C. 141, 621 S.E.2d 344 (2005), our Supreme Court explained the difference between contraband per se and derivative contraband.  There, the Court noted:

> Courts have recognized two classes of contraband subject to forfeiture by statute. The first class is contraband per se, which are things that may be forfeited because they are illegal to possess and not susceptible of ownership. This class includes illegal gambling devices such as roulette wheels or craps tables, "moonshine" liquor, illegal narcotic drugs, or unregistered guns. The second class is derivative contraband, which are things that may be forfeited because they are instrumentalities of a crime, but which ordinarily are not illegal to possess. This class includes items such as currency, vehicles, or real property used in the commission of a crime or traceable to the proceeds of criminal activity. See State v. 192 Coin–Operated Video Game

Mr. Mark A. Keel, Chief
Page 10
July 10, 2019

> Machines, 338 S.C. 176, 189, 525 S.E.2d 872, 879 (2000) (discussing two classes of
> contraband and determining that video game machines found by magistrate to be
> illegal gambling devices or conceded by owner to be such are contraband per se );
> U.S. v. Rodriguez Aguirre, 264 F.3d 1195, 1213 n. 13 (10th Cir.2001) (cocaine
> is contraband per se; automobile used in bank robbery is derivative contraband); State
> v. Edwards, 787 So.2d 981, 988–89 (La.2001) (discussing two classes of
> contraband); People ex rel. O'Malley v. 6323 North LaCrosse Ave., 158 Ill.2d 453,
> 199 Ill.Dec. 690, 634 N.E.2d 743, 746 (1994) ("Contraband per se consists of items
> which are inherently illegal to possess. There is a vast difference between the
> forfeiture of contraband per se and the forfeiture, by an innocent third party, of legal
> property—in this case a residence."); People v. One 1941 Chevrolet Coupe, 37
> Cal.2d 283, 231 P.2d 832, 843 (1951) (distinguishing between derivative contraband
> such as automobile and contraband per se or public nuisances per se such as
> gambling paraphernalia, counterfeit coins, diseased cattle, or decayed fruit and fish);
> State ex rel. Brett v. Four Bell Fruit Gum Slot Machines, 196 Okla. 44, 162 P.2d 539
> (1945) (slot machines are contraband per se ); Frost v. People, 193 Ill. 635, 61 N.E.
> 1054, 1056 (1901) (craps tables and roulette wheel are contraband per se because
> they "had no value or use for any other purpose than that of gambling"); City of
> Chicago v. Taylor, 332 Ill.App.3d 583, 266 Ill.Dec. 244, 774 N.E.2d 22, 31 (2002)
> (unregistered gun is contraband per se in locality which requires registration of
> guns)...

366 S.C. at 149-50, 621 S.E.2d at 348. Courts have noted that "contraband per se consists of those items whose possession alone constitutes a criminal offense and such articles need not be returned even if improperly seized." People v. Steskall, 302 N.E.2d 321, 323 (Ill. 1973). As was stated by the Court in U.S. v. Ten Miscellaneous Firearms, 622 F.Supp. 759, (D. Neb. 1985), "contraband properties per se are 'objects, the possession of which without more constitutes a crime.'" [quoting One Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965)]. See also Com. v. Anthony, 613 A.2d 581, 584 (Pa. 1992) ["... contraband per se is property which is inherently illegal, and which absent further evidence, subjects its possessor to criminal sanction."]; State v. 192 Coin-Operated Video Game Machines, 338 S.C. 176, 187-88, 525 S.E.2d 872, 878 (2000) [gambling devices are contraband per se and "need not be operational or in complete repair before they are subject to seizure and destruction."]; Op. S.C. Att'y Gen., 2000 WL 331120661 (Dec. 7, 2000) ["contraband per se is material the mere possession of which constitutes a crime."].

Numerous courts have concluded that where the law requires a license or permit to possess a particular good or commodity, the unregistered or unlicensed possession of that good or commodity constitutes contraband per se. In U.S. v. Ten Miscellaneous Firearms, supra, the Court concluded that possession of an unregistered firearm rendered the firearm contraband per se. And in State v. Manuel, 426 So.2d 140, 144 (La. 1983), the Court noted that contraband per se consists of "things which intrinsically are illegal to possess and are therefore insusceptible of ownership" such as illegal narcotics, unregistered stills, unlawful alcohol and illicit gambling devices. And, as noted, in Mims, supra, our Supreme Court stated that items which typically are deemed contraband per se include "illegal gambling devices such as roulette wheels, or crap

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 11
July 10, 2019

tables, 'moonshine' liquor, illegal narcotic drugs, or unregistered guns." 366 S.C. at 149-50, 621 S.E.2d at 348. See also City of Chicago v. Taylor, 774 N.E.2d 22, 31 (Ill. 2002) "once John Taylor's unregistered shotgun came into the City of Chicago, it became contraband per se and subject to the confiscation and destruction provision of the City's ordinance."]; Kromeich v. City of Chicago, 630 N.E.2d 913 (Ill. 1994) [unregistered firearm]; Dist. Atty of King's County v. Iadarola, 623 N.Y.S. 999, 1004, n. 1 (New York 1995) ["Contraband per se items are objects that are inherently illegal to possess, such as drugs, unlicensed weapons or stolen property."].

As noted above, § 46-55-20 makes it "unlawful for a person to cultivate, handle or process hemp without a hemp license. Hemp is defined by § 46-55-10(8) as

> . . .the plant Cannabis sativa L, and any part of that plant, including the nonsterilized seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with the federally defined THC limit for hemp. Hemp shall be considered an agricultural commodity.

Thus, a court would likely conclude, based upon the foregoing authorities, that possession of unprocessed or raw hemp plant material without the requisite license is rendered contraband per se by § 46-55-20. As we have heretofore recognized, the issue of whether property in a given circumstances is contraband per se "must be determined initially by law enforcement and ultimately by the fact finder in a court of law." Op. S.C. Att'y Gen., 2005 WL 1024601 (April 29, 2005). See also, State v. 192 Video Game Machines, supra. Accordingly, we defer to law enforcement and the courts as to whether, in a given situation, property constitutes unprocessed or raw hemp plant material possessed without a license.

Your next question is whether "merely placing raw plant material in a package constitute[s] processing hemp into a hemp product?" The answer to this question is clearly "no." The term "processing" is defined by the Act in § 46-55-10(12) as "converting an agricultural commodity into a marketable form." The term "hemp products" is defined in § 46-55-10(9) and clearly states that "[u]nprocessed or raw plant material, including nonsterilized hemp seeds, is not considered a hemp product." Thus, unprocessed raw hemp cannot be changed into a "hemp product" merely by placing it in a package. Again, we defer to law enforcement as to whether, in a given situation, the material is unprocessed, raw hemp or a hemp product.

Finally, you ask "[w]hat are the potential penalties associated with retail sale or possession of a substance that contains more than a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis using post-decarboxylation or similarly reliable methods?" Section 46-55-10(6) defines "Federally defined THC level for hemp" as "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis, of the THC concentration for hemp defined in 7 U.S.C. SECTON 5940, whichever is greater."

We assume your question relates only to the retail sale or possession of substances which exceed the definition of "Federally defined THC level for hemp." Of course, each situation will be fact-specific. However, in a given instance, possession or sale of material containing more

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 12
July 10, 2019

than delta-9 THC concentration of more than 0.3 percent using post-decarboxylation or similarly reliable methods would likely be deemed to constitute marijuana and, as you note in your letter, "punishable by all currently existing South Carolina state and federal laws prohibiting possession, distribution, possession with intent to distribute, and trafficking marijuana." If such is the case, law enforcement, in a given instance, where the facts are so warranted, may charge the individual under the State's relevant drug laws.

## Conclusion

1.      We readily acknowledge that the Hemp Farming Act of 2019 was not drafted with the greatest of clarity and needs legislative or judicial clarification. Having said that, the Act makes it "unlawful" for a person, without a license, to cultivate, handle, possess or process hemp, as defined in the Act. The Act, however, is expressly made inapplicable to the "possession, handling, transport, or sale of hemp products or extracts, including those containing hemp-derived cannabinoids, including CBD." Unprocessed or raw plant material, including nonsterilized hemp seeds, is expressly excluded from the definition of "hemp products" under the Act.

2.      As we have advised on numerous occasions, because "'this Office does not have the authority of a court, the Attorney General cannot investigate or determine facts.' Any determination as to whether there has been a violation [here, of the Hemp Farming Act], therefore would be a factual decision for . . . law enforcement and/or the local prosecutor's office. Such would have to be determined on a case-by-case basis." Op. S.C. Att'y Gen., 2011 WL 5304073 (October 6, 2011). Thus, we must defer to law enforcement in this regard. Inasmuch as your questions generally relate to the possession or sale of "unprocessed or raw hemp plant material," it is for law enforcement, in the first instance, and the courts ultimately, to determine whether material is "unprocessed or raw hemp plant material" or "hemp products." Such a question is, in a given instance, factual and beyond the scope of an opinion of this Office.

3.      As noted above, § 46-55-20 makes it "unlawful" to cultivate, handle or process hemp, as defined, without a license. "Handling" of hemp includes possession or storing "for any period of time," and also includes storing in a vehicle, but does not include "possessing or storing finished hemp products." Thus, the statute makes it clear that the mere possession of raw unprocessed hemp or hemp not in a finished hemp product without a license is unlawful. See Commonwealth v. Lundy, supra [possession of hemp without a license is a criminal offense under Kentucky law]. With respect to your questions concerning whether the term "unlawful" means criminal, and if so, what penalties are involved, we note the following. The question is difficult because in a prior opinion of this Office, we observed that "unlawful" does not necessarily mean "criminal." However, we note that in State v. Cofield, supra, our Supreme Court has read a similar statute, making it "unlawful" to sell liquor without a license, to be "criminal" in nature. Moreover, it may be reasonably argued that in the context of the Act's passage, the General Assembly meant to treat the term "unlawful" as meaning "criminal" with respect to the cultivation, handling or possession of hemp without a license. Because all hemp

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 13
July 10, 2019

cultivation or possession was previously deemed a controlled substance, regardless of THC composition, it makes sense that the Legislature intended that possession of hemp without a license constitutes a criminal offense.

4.      Assuming possession of hemp without a license is a criminal offense under the statute, in our judgment, the requisite criminal penalty would likely be controlled by § 17-25-30, which provides for a criminal penalty, where none is set forth by statute. We reiterate that law enforcement and the courts must determine whether § 46-55-20 has been violated in a particular situation.

5.      A court is likely to conclude that possession and handling of unprocessed or raw hemp material without a license is contraband per se and subject to seizure. We have referenced herein numerous decisions to such effect. See e.g. Mims Amusement Co. v. SLED, supra (defining contraband per se). We defer to law enforcement, in a given situation, based upon the relevant facts, as to whether material is raw or unprocessed hemp and whether § 46-55-20 has been violated.

6.      Of course, raw or unprocessed hemp cannot be converted to something else – such as a hemp product – merely by placing it in a package. Section 46-55-10(9) expressly states that "[u]nprocessed or raw plant material, including nonsterilized hemp seeds, is not considered a hemp product." Thus, merely placing such unprocessed or raw plant material in a package does not change its nature or character.

As stated, however, we defer to law enforcement, in a given situation, based upon the relevant facts and circumstances, as to whether material is raw or unprocessed hemp plant material is instead a hemp product, as defined in the Act. Such a determination is beyond the scope of an opinion of this Office.

7.      With respect to your last question, possession or sale of material containing more than delta-9 THC concentration of more than 0.3 percent using post-decarboxylation or similarly reliable methods would likely be deemed to constitute marijuana. As the Court stated in U.S. v. Mallory, supra, in the federal Farm Bill, "Congress finally statutorily removed hemp from the definition of 'marijuana' under the CSA. . . ." Thus, as you noted in your letter, if material contains more than delta-9 THC concentration of not more than 0.3 percent, based upon the relevant circumstances, possession or retail sale would be "punishable by all currently existing South Carolina state and federal laws prohibiting possession, distribution, possession with intent to distribute and trafficking marijuana." Of course, we defer to law enforcement in making such factual determination.

There is one recent case which we call to your attention. In Lundy supra, the defendant was convicted of possession of marijuana. He had no hemp license. He argued that the THC level was, nevertheless, within the limit for industrial hemp. The Court upheld the conviction, however, noting that because the defendant did not possess a license, it did not matter what the

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Mr. Mark A. Keel, Chief
Page 14
July 10, 2019

THC level was. According to the Court, "[i]f the facts were different and Mark <u>could legally</u> <u>possess industrial hemp plants or was in possession of a commercial hemp product containing</u> <u>THC, we would agree that the Commonwealth must establish the THC level in the plants or the</u> <u>product was more than .3 percent</u>. That simply is not the case." 511 S.W.3d at 407 (emphasis added). Thus, the <u>Lundy</u> Court concluded that possession of hemp without a license was illegal regardless of the THC concentrate and upheld a conviction for possession of marijuana. Such an analysis by the Kentucky Court of Appeals provides a good guidepost here.

Sincerely,

Robert D. Cook
Solicitor General

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356



ALAN WILSON
ATTORNEY GENERAL

October 4, 2021

Chief Mark A. Keel
South Carolina Law Enforcement Division
PO Box 21398
Columbia, SC 29221-1398

Dear Chief Keel:

We received your request for an opinion clarifying the application of South Carolina's Hemp Farming Act as it relates to THC and THC variants. This opinion sets out our Office's understanding of your question and our response.

**Issue (as quoted from your letter):**

In South Carolina, Tetrahydrocannabinol (THC) is a controlled substance listed in Schedule I. . . . As such, it is clear to SLED that the possession, possession with intent to distribute, or distribution of THC is explicitly prohibited by South Carolina law and all existing penalties apply. *See* S.C. Code Ann. § 44-53-370(b)(2). However, South Carolina's Hemp Farming Act, S.C. Code Ann. § 44-56-10 *et seq.*, may authorize certain licensed individuals to cultivate, process, and handle hemp or hemp products in South Carolina. That said, SLED is informed and believes that any authorization provided by the Hemp Farming Act is clearly limited to hemp or hemp products that contain the "federally defined THC level for hemp", which is "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis" determined by using post-decarboxylation or similarly reliable methods. *See* S.C. Code Ann. § 46-55-10(6), (8), (9).

In that regard, SLED is informed and believes that any and all THC that is not "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis" is specifically prohibited by the clear and unambiguous language of S.C. Code Ann. § 44-53-190(D)(18). To that end, SLED is informed and believes that this unambiguous language would clearly criminalize the possession, possession with intent to distribute, or distribution of any and all amounts of delta-8 THC, or any other variant of THC, found in South Carolina.

Chief Mark A. Keel
South Carolina Law Enforcement Division
Page 2
October 4, 2021

   Simply put, delta-8 THC and delta-9 THC are different compounds with different chemical and structural properties and SLED's forensic testing can absolutely differentiate delta-8 THC and delta-9 THC through analytical testing. Accordingly, SLED is informed and believes that the Hemp Farming Act does not apply to delta-8 THC, or any other THC variant, in any way whatsoever because delta-8 THC does not meet the "federally defined THC level for hemp". It also bears noting that Tetrahydrocannabinols are also Schedule I substances prohibited by federal law.

   However, SLED would appreciate your opinion on SLED's analysis in this matter.

### Law/Analysis:

Section 44-53-190 of the South Carolina Code sets out our State's list of Schedule I controlled substances. Subsection 44-53-190(D) lists, in relevant part:

> Any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances, their salts, isomers, and salts of isomers, unless specifically excepted, whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:
>
> . . .
>
> (11) Marijuana
>
> . . .
>
> (18) Tetrahydrocannabinol (THC)

S.C. Code Ann. § 44-53-190(D)(11) & (18) (2018).

   The laws of some other jurisdictions have distinguished between THC contained in cannabis and pure THC, whether extracted or synthetically created. *See, e.g., Aycock v. State,* 246 S.E.2d 489 (Ga. Ct. App. 1978). However, South Carolina law does not, in that section 44-53-190 lists each of them as Schedule I controlled substances "unless specifically excepted." § 44-53-190.

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Chief Mark A. Keel
South Carolina Law Enforcement Division
Page 3
October 4, 2021

Section 44-53-190 also does not distinguish between various isomers of THC, except to provide that "[a]ny . . . isomers" are included. *Id.* Delta-8 THC is one such isomer, as explained by Georgia Court of Appeals in *Aycock v. State,* 246 S.E.2d 489 (Ga. Ct. App. 1978):

> THC is the psychopharmacologically active component of the cannabis plant. Most THC exists in the form of an isomer known as delta-9-THC, but somewhat less than ten percent of naturally occurring THC is of the delta-8 isomer. Both delta-8-THC and delta-9-THC produce a psychological effect. They are found in all cannabis plants, and they are not known to exist elsewhere in nature. Concentrations of THC can be produced in two ways, either by chemically extracting it from the cannabis plant or by synthesizing it in the laboratory.

As noted above, South Carolina law designates all isomers of THC as Schedule I controlled substances "unless specifically excepted." S.C. Code Ann. § 44-53-190 (2018). The Hemp Farming Act of 2019 is one such exception, as discussed thoroughly in prior opinions of this Office. S.C. Code Ann. § 46-55-10 *et seq.*; *see also Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019). Section 46-55-10 contains several key definitions for purposes of the Hemp Farming Act which we quote here:

> (6) "Federally defined THC level for hemp" means a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis, or the THC concentration for hemp defined in 7 U.S.C. SECTION 5940, whichever is greater.

> . . .

> (8) "Hemp" or "industrial hemp" means the plant Cannabis sativa L. and any part of that plant, including the nonsterilized seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with the federally defined THC level for hemp. Hemp shall be considered an agricultural commodity.

> . . .

> (9) "Hemp products" means all products with the federally defined THC level for hemp derived from, or made by, processing hemp plants or hemp plant parts, that are prepared in a form available for commercial sale, including, but not limited to, cosmetics, personal care products, food intended for animal or human consumption, cloth, cordage, fiber, fuel, paint, paper, particleboard, plastics, and

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Chief Mark A. Keel
South Carolina Law Enforcement Division
Page 4
October 4, 2021

> any product containing one or more hemp-derived cannabinoids, such as cannabidiol. Unprocessed or raw plant material, including nonsterilized hemp seeds, is not considered a hemp product.
>
> . . .
>
> (11) "Marijuana" has the same meaning as in Section 44-53-110 and does not include tetrahydrocannabinol in hemp or hemp products <u>as defined herein</u>.

S.C. Code Ann. § 46-55-10 (Supp. 2020) (emphasis added). We have highlighted throughout this quotation that the lawfulness of hemp and hemp products all hinge on the "federally defined THC level for hemp," which means "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis." §46-55-10(6); *see also* 7 U.S.C. § 5940(a)(2) ("The term 'industrial hemp' means the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.").

The Hemp Farming Act does not expressly address delta-8 THC, or any isomer besides delta-9. It does, however, specify application of the Act: "The provisions contained in this chapter do not apply to the possession, handling, transport, or sale of hemp products and extracts, including those containing hemp-derived cannabinoids, including CBD. Nothing in this chapter authorizes any person to violate any federal <u>or state law</u> or regulation." S.C. Code Ann. § 46-55-30 (Supp. 2020) (emphasis added).

To date, it appears that there are no reported appellate cases in South Carolina construing the Hemp Farming Act. However, our Office has opined previously on the scope and application of the Act. *See, e.g., Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019). This opinion should be read in the context of, and consistent with, those prior opinions.

We turn now to the July 10, 2019 opinion addressed to you where we reasoned that "anything exceeding the 0.3% concentration of THC, <u>as defined</u> [by the Hemp Farming Act], transforms industrial hemp into a controlled substance (marijuana) under federal and state law." *Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019) (emphasis added). The opinion went on to conclude that "possession or sale of material containing more than delta-9 THC concentration of more than 0.3 percent using post-decarboxylation or similarly reliable methods would likely be deemed to constitute marijuana." *Id.* Therefore, we concluded, "if material contains <u>more than delta-9 THC concentration of not more than 0.3 percent</u>, based upon the relevant circumstances, possession or retail sale would be 'punishable by all currently existing South Carolina state and

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Chief Mark A. Keel
South Carolina Law Enforcement Division
Page 5
October 4, 2021

federal laws prohibiting possession, distribution, possession with intent to distribute and trafficking marijuana.'" *Id.* (emphasis added). While that opinion did not expressly consider the question of isomers, this language reflects our view that the General Assembly intended the Hemp Farming Act to create an exception that is narrow. *See id.*

That opinion also emphasized that "[a]ny determination as to whether there has been a violation . . . would have to be determined on a case-by-case basis," and that "we must defer to law enforcement in this regard." *Id.* Accordingly, it is beyond the scope of any opinion of this Office to say whether a particular criminal statute is violated in a particular instance. We also observed that "the Hemp Farming Act of 2019 was not drafted with the greatest of clarity and needs legislative or judicial clarification." *Id.*

Our Office has received and carefully reviewed memoranda prepared by a representative of the hemp industry which posit that delta-8 and other isomers of THC are legal. The essential argument may be summarized as follows: the Hemp Farming Act legalized "all derivatives, extracts, cannabinoids, [and] isomers" with "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis." S.C. Code Ann. § 46-55-10. Because delta-9 was the only THC isomer expressly regulated in the Act THC, any other isomer extracted or derived from hemp is lawful – provided the delta-9 concentration remains below 0.3. Therefore, they reason, delta-8 and any isomers of THC other than delta-9 became legal under South Carolina law as a result of the Hemp Farming Act. Moreover, under this construction of the law, any concentration of isomer of THC other than delta-9 also became legal, regardless of psychoactive potential.

In support of their proposed construction, the industry points out that the General Assembly could have defined hemp as having "a THC concentration of not more than 0.3 percent," without reference to specific isomers. Instead, the General Assembly defined hemp by reference to one specific isomer, delta-9. The industry posits that this choice was deliberate, and was intended to legalize other isomers. They also point out that to the extent that the statutes are in conflict, the Hemp Farming Act was passed later in time and is more specific than section 44-53-190, which categorizes all isomers of THC as Schedule I substances.

We believe that a court ultimately would reject these arguments for the reasons explained hereafter. However, these are arguments that a serious stakeholder can make in good faith, as a result of some of the gaps in the Hemp Farming Act. They highlight the persisting need for legislative clarification, which prior opinions of this Office have identified. *Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019).

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Chief Mark A. Keel
South Carolina Law Enforcement Division
Page 6
October 4, 2021

Notwithstanding that need for clarification, however, we believe that the application of the law here is relatively straightforward. The basic purpose of the Hemp Farming Act is to create a legal framework for the licensed, regulated production of industrial hemp as defined, and it must be construed consistent with that purpose. Section 44-53-190(D) still categorizes all isomers of THC as Schedule I controlled substances "unless specifically excepted." S.C. Code Ann. § 44-53-190(D) (2018). The Hemp Farming Act creates such a specific exception in certain circumstances for hemp containing up to a specific level of one specific isomer – that is, delta-9 THC. S.C. Code Ann. § 46-55-10 *et seq.* (Supp. 2020). It does not create an express exception for delta-8 THC, or any other THC isomer. *See id.* Lawful hemp as contemplated by the Hemp Farming Act may contain trace amounts of THC isomers, such as delta-8. *See Aycock v. State,* 246 S.E.2d 489 (Ga. Ct. App. 1978). However, this legislative scheme cannot fairly be read to legalize delta-8 THC or any other isomer of THC in itself. And although the Hemp Farming Act was passed later in time and is more specific than section 44-53-190, we believe these statutes do not conflict in the way that the industry posits. Instead, the Hemp Farming Act simply creates a specific exception to accomplish a particular purpose, as contemplated in section 44-53-190(D).

### Conclusion:

In conclusion, we believe a court would hold that the Hemp Farming Act does not provide an exception for, and does not legalize, delta-8 THC or any other isomer of THC in itself. Section 44-53-190(D)(18) (2018) categorizes all isomers of THC as Schedule I controlled substances "unless specifically excepted." The only exceptions found in the Hemp Farming Act involve "a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis." S.C. Code Ann. § 46-55-10 (Supp. 2020); *see also* 7 U.S.C. § 5940. Our Office has observed in the past that "the Hemp Farming Act of 2019 was not drafted with the greatest of clarity and needs legislative or judicial clarification." However, we believe that any good-faith reading of the plain language of the Act in conjunction with section 44-53-190 supports our conclusion here. *See Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019). This reading also is consistent with the prior opinion of this Office which reflects our view that the General Assembly intended the Hemp Farming Act to create an exception that is narrow. *Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019)

Lawful hemp as contemplated by the Hemp Farming Act may contain trace amounts of THC isomers, such as delta-8. *See Aycock v. State,* 246 S.E.2d 489 (Ga. Ct. App. 1978). This opinion should not be read so as to speak to those trace amounts. We express no opinion on what any upper limit of THC isomer concentrations in lawful hemp might be, beyond the statutorily-

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

Chief Mark A. Keel
South Carolina Law Enforcement Division
Page 7
October 4, 2021

expressed limit placed on delta-9 THC. *See* S.C. Code Ann. § 46-55-10 (Supp. 2020). We understand that your question is focused on delta-8 and other THC isomers in themselves, not these trace amounts. This opinion should be read in the context of, and consistent with, the other prior opinions of this Office which address the Hemp Farming Act.

The industry has advanced several arguments in favor of construing the Hemp Farming Act as legalizing delta-8 and other isomers of THC. These are arguments that a serious stakeholder can make in good faith, as a result of some of the gaps in the Hemp Farming Act. They highlight the persisting need for legislative clarification, which prior opinions this Office have identified. *Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019).

However, we believe that the application of the law here is relatively straightforward. The basic purpose of the Hemp Farming Act is to create a legal framework for the licensed, regulated production of industrial hemp as defined, and it must be construed consistent with that purpose. The plain text of the Hemp Farming Act and section 44-53-190(D) each operate in tandem to create a narrow exception for lawful hemp as defined, while preserving the existing prohibition on other isomers of THC.

In summary, our Office agrees with SLED's essential analysis that the Hemp Farming Act did not legalize THC except as defined in lawful hemp. If the General Assembly intended to undertake legalization of THC on the scale that the industry posits, they would have done so expressly and unambiguously. Instead, the legislative scheme of the Hemp Farming Act was much narrower: to create a legal framework for the licensed, regulated production of industrial hemp as defined. It cannot fairly be read to accomplish sweeping THC legalization or a similar sea change from previous policy.

We reiterate that any determination as to whether there has been a violation of the Hemp Farming Act or other criminal laws is a factual question which this Office cannot answer in an opinion. *Op. S.C. Att'y Gen.*, 2019 WL 3243864 (July 10, 2019). We defer to law enforcement and the local prosecutor's office to make such determinations on a case-by-case basis. *Id.*

Sincerely,

David S. Jones
Assistant Attorney General

Chief Mark A. Keel
South Carolina Law Enforcement Division
Page 8
October 4, 2021


REVIEWED AND APPROVED BY:

Robert D. Cook
Solicitor General

ELECTRONICALLY FILED - 2023 Oct 04 11:28 AM - CLARENDON - COMMON PLEAS - CASE#2023CP1400356

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF CLARENDON** | ) | C/A NO.:  2023-CP-14-00356 |
| | ) | |
| A.S. and C.J. by and through their Guardian ad Litem Ashley Berry, | ) ) | |
| | ) | |
| Plaintiff, | ) | **ANSWER ON BEHALF OF** |
| | ) | **DEFENDANTS** |
| vs. | ) | |
| | ) | {Jury Trial Demanded} |
| South Carolina Department of Social Services (SCDSS), Tasha Barkley, Lakisha M. Hamilton, Shaneka Dixon, Kelly McCabe, Dana S. Pressley, Amanda Quinlan-Head (Graham), Deborah Reynolds, Yolanda M. Gamble Speights, Latoya Jackson, and Michael Leach, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

Defendants South Carolina Department of Social Services (DSS), Tasha Barkley, Lakisha M. Hamilton, Shaneka Dixon, Kelly McCabe, Dana S. Pressley, Amanda Quinlan-Head (Graham), Deborah Reynolds, Yolanda M. Gamble Speights, Latoya Jackson, and Michael Leach (hereinafter "Defendants") hereby answer the Plaintiffs' Complaint as follows:

## GENERAL RESPONSE

Each and every allegation of Plaintiffs' Complaint that is not hereinafter specifically admitted, modified, or explained is denied and strict proof is demanded thereof.  Defendants are compelled to make a blanket denial of *any* wrongdoing on their behalf regarding the allegations asserted by Plaintiffs in this matter.

## FOR A FIRST DEFENSE

1.     The Summons and Complaint fail to state a claim upon which relief can be granted.

1

**FOR A SECOND DEFENSE**

2.     Defendants deny each and every allegation of the Plaintiffs' Complaint not hereinafter specifically admitted, qualified, or explained.

3.     As to the allegations set forth in Paragraph 1 of the Complaint, Defendants would admit same upon information and belief.

4.     As to the allegations set forth in Paragraphs 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 of the Complaint, Defendants would admit only that DSS is a Department and/or arm-of-the-state of South Carolina, and that each of the named individuals are, or were at the times relevant to the matters at issue in this case, employees of DSS.  As to the remaining allegations set forth in said Paragraphs, Defendants deny same as stated.  Further answering, to the extent those allegations attempt to establish liability on the part of Defendants, those allegations are denied.

5.     As to the allegations set forth in Paragraphs 13 and 14 of the Complaint, Defendants assert that said allegations are jurisdictional in nature and/or attempt to establish legal conclusions, and therefore Defendants crave reference thereto.

6.     As to Paragraph 15 of the Complaint, Defendants repeat and reiterate their responses to the allegations set forth in the corresponding paragraphs of Plaintiffs' Complaint.  Defendants object to the jumbling of causes of action.

7.     As to the allegations set forth in Paragraphs 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, and 46 of the Complaint, Defendants admit only that a Family Court matter was initiated relating to A.S. and C.J. relating to possible child abuse and/or neglect.  As to the remaining allegations set forth in said Paragraph, to the extent those allegations attempt to establish liability on the part of Defendants, those allegations are denied.

2

8.    As to the allegations set forth in Paragraph 47, Defendants repeat and reiterate their responses to the allegations set forth in the corresponding paragraphs of Plaintiffs' Complaint. Defendants object to the jumbling of causes of action.

9.    As to the allegations set forth in Paragraphs 48, 49, 50, 51, 52, 53, and 54 of the Complaint, Defendants assert that said allegations attempt to establish legal conclusions and therefore crave reference thereto.  Further answering, to the extent said allegations attempt to establish liability on the part of Defendants, those allegations are denied.

10.    As to the allegations set forth in Paragraphs 55, 56, 57, 58, 59, and 60 of the Complaint, Defendants deny same and demand strict proof thereof.

11.    As to the allegations set forth in Paragraph 61 of the Complaint, Defendants repeat and reiterate their responses to the allegations set forth in the corresponding paragraphs of Plaintiffs' Complaint.  Defendants object to the jumbling of causes of action.

12.    As to the allegations set forth in Paragraphs 62, 63, 64, 65, 66, 67, 68, and 69 of the Complaint, Defendants deny same and demand strict proof thereof.

13.    As to the allegations set forth in Paragraph 70 of the Complaint, Defendants repeat and reiterate their responses to the allegations set forth in the corresponding paragraphs of Plaintiffs' Complaint.  Defendants object to the jumbling of causes of action.

14.    As to the allegations set forth in Paragraphs 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, and 82 of the Complaint, Defendants deny same and demand strict proof thereof.

15.    As to the allegations set forth in Paragraph 83 of the Complaint, Defendants repeat and reiterate their responses to the allegations set forth in the corresponding paragraphs of Plaintiffs' Complaint.  Defendants object to the jumbling of causes of action.

16.     As to the allegations set forth in Paragraphs 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, and 94 of the Complaint, Defendants deny same and demand strict proof thereof.

17.     That as to the WHEREFORE Paragraph of the Complaint, Defendants would deny same and demand strict proof thereof.

18.     Defendants deny Plaintiffs are entitled to the relief sought in their Complaint, or any other relief, from Defendants.

## FOR A THIRD DEFENSE

19.     Defendants assert legal justification, and that such legal justification bars the claims set forth by the Plaintiffs in this Complaint.

## FOR A FOURTH DEFENSE

20.     Defendants assert that the principle of *respondeat superior* does not apply to actions brought pursuant to 42 U.S.C. §1983.

## FOR A FIFTH DEFENSE

21.     The Individually named Defendants would allege that at no time have they violated any clearly established constitutional rights which were known or should have been known to them, and therefore these Defendants are entitled to immunity.

## FOR A SIXTH DEFENSE

22.     The actions of the Individually named Defendants, at all times relevant to the allegations set forth in the Complaint, were objectively reasonable under the existing law, and therefore these Defendants are entitled to immunity.

## FOR A SEVENTH DEFENSE

23.     Plaintiffs have failed to establish a justiciable claim against Defendants.  Plaintiff's Complaint fails to state a claim for which relief shall be granted pursuant to Rule 8 and Rule 12 of

the Federal Rules of Civil Procedure and, therefore, must be dismissed as a matter of law.

## FOR AN EIGHTH DEFENSE

24.     Plaintiffs have jumbled their causes of action and claims and therefore this action should be dismissed.

## FOR A NINTH DEFENSE

25.     To the extent Plaintiffs have alleged state law claims sounding in tort, Defendants are immune from suit pursuant to the provisions of S.C. Code Ann. §§ 15-78-60 (1), (2), (3), (4), (5), (6), (9), (13), (20), (23), and (25).

## FOR A TENTH DEFENSE

26.     To the extent Plaintiffs have alleged state law claims sounding in tort, Defendants assert the damages caps and prohibition against recovery of punitive or exemplary damages set forth in the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-120.

## FOR AN ELEVENTH DEFENSE

27.     These Defendants and/or their employees are governmental officials performing discretionary functions and actions which could reasonably have been thought consistent with the rights of the Plaintiffs for which they are alleged to have violated, and therefore Defendants are entitled to immunity as a matter of law.

## FOR A TWELFTH DEFENSE

28.     To the extent Plaintiffs have alleged any state law claims against Defendants, sounding in tort, Defendants, upon information and belief, allege that any injuries or damages allegedly suffered by Plaintiffs, without admitting same to be true, were due to and caused entirely by the negligence of Plaintiffs, or the negligence of Plaintiffs, which is more than the alleged negligence of Defendants, and that such is a complete bar to Plaintiffs' recovery herein.  Further,

Defendants, upon information and belief, allege that if the negligence of Plaintiffs was less than the alleged negligence of Defendants, that such negligence should be compared to the alleged negligence of Defendants, so as to apportion the relative fault as to each party.

<strong><u>FOR A THIRTEENTH DEFENSE</u></strong>

29.     Defendants are entitled to sovereign immunity.

<strong><u>FOR A FOURTEENTH DEFENSE</u></strong>

30.     Defendants are entitled to sovereign immunity for all claims for punitive damages.  Punitive damages are not recoverable under 42 U.S.C. § 1983 against them.  *See City of Newport News v. Fact Concerts, Inc.,* 453 U.S. 247 (1981).

<strong><u>FOR A FIFTEENTH DEFENSE</u></strong>

31.     Plaintiffs' claims are barred by the public duty rule.

<strong><u>FOR A SIXTEENTH DEFENSE</u></strong>

32.     Defendants are entitled to absolute immunity under *Long v. Seabrook* and its progeny.

<strong><u>FOR A SEVENTEENTH DEFENSE</u></strong>

33.     Defendants would allege that any and all claims for punitive damages that have been asserted against them are barred by the common law of the United States and the State of South Carolina.

<strong><u>FOR AN EIGHTEENTH DEFENSE</u></strong>

34.     Defendants would allege upon information and belief that during the performance or nonperformance of their employees' duties, their employees were not guilty of either corruption, bad faith, or malicious motives.  Moreover, at all times referenced in Plaintiffs' Complaint, Defendants' employees were exercising their discretionary authority as public employees of DSS, and were acting in good faith, and therefore Defendants are immune from suit.

## FOR A NINETEENTH DEFENSE

35.     Defendants and/or their employees were engaged in the performance of their official duties, and at no time violated any clearly established constitutional rights of the Plaintiffs, which were known or should have been known to them, and therefore they are entitled to immunity as a matter of law.

## FOR A TWENTIETH DEFENSE

36.     Defendants would plead as a complete bar to this action Plaintiffs' assumption of the risk of their actions.

## FOR A TWENTY-FIRST DEFENSE

37.     Defendants would allege Plaintiffs cannot establish a loss from their claims as defined and required by the South Carolina Torts Claim Act, S.C. Code Ann. § 15-78-30(f), and therefore, said claims must be dismissed.

## FOR A TWENTY-SECOND DEFENSE

38.     With regards to Plaintiffs claims for injunctive relief, Defendants assert this Court should abstain from hearing said claims.

## FOR A TWENTY-THIRD DEFENSE

39.     Plaintiffs are not entitled to injunctive relief of any kind from Defendants because Plaintiffs are not likely to succeed on the merits, Plaintiffs cannot demonstrate irreparable harm, the balance of the equities does not tip in Plaintiffs' favor, and an injunction would not be in the public interest.

## FOR A TWENTY-FOURTH DEFENSE

40.     Plaintiffs lack standing to allege their purported claims for injunctive relief.

## FOR A TWENTY-FIFTH DEFENSE

41.     Defendants assert that this Court lacks subject matter jurisdiction over some, or all, of Plaintiffs' claims against Defendants.

## FOR A TWENTY-SIXTH DEFENSE

42.     Defendants' investigation into the facts of this case has not been completed and, therefore, Defendants reserve any additional and further defenses as may be revealed by additional information during the course of any discovery and/or investigation and is consistent with the South Carolina and/or Federal Rules of Civil Procedure.

WHEREFORE, having fully answered the Complaint of Plaintiffs, Defendants pray that the Complaint be dismissed with prejudice, and for such other and further relief as the Court deems just and proper.

SMITH | ROBINSON

_s/ Daniel C. Plyler_
DANIEL C. PLYLER, SC Bar #72671
2530 Devine Street, Third Floor
Columbia, SC 29205
T: 803-254-5445
F: 803-254-5007
Daniel.Plyler@SmithRobinsonLaw.com

*Counsel for Defendants*

Columbia, South Carolina

November 3, 2023

8